IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

ROBERT EARL SMITH, )
)
Petitioner, )
)
v. )                                          Case No. 2:12-cv-02436-STA-dkv
)
MIKE PARRIS, )
)
Respondent. )
)

**ORDER TO MODIFY THE DOCKET,
DENYING PETITION PURSUANT TO 28 U.S.C. § 2254,
DENYING A CERTIFICATE OF APPEALABILITY,
CERTIFYING THAT AN APPEAL WOULD NOT BE TAKEN IN GOOD FAITH
AND
DENYING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL**

Before the Court is the amended Petition Under 28 U.S.C.A. § 2254 for Writ of Habeas

Corpus by a Person in State Custody ("Amended § 2254 Petition") filed by Petitioner, Robert Earl

Smith, Tennessee Department of Correction prisoner number 200969, an inmate at the Northwest

Correctional Complex ("NWCX") in Tiptonville, Tennessee. (Am. § 2254 Pet., *Smith v. Parris,*

No. 2:12-cv-02436-STA-dkv (W.D. Tenn.), ECF No. 7.)   For the reasons stated below, the Court

DENIES the Amended § 2254 Petition.

I.        **BACKGROUND**

        A.        **State Court Procedural History**

        On December 5, 2002, a grand jury in Shelby County, Tennessee, returned a single-count

indictment charging Smith with the second degree murder of Anthony Dorsey.   (Indictment, *State*

*v. Smith*, No. 02-09026 (Shelby Cnty. Crim. Ct.), ECF No. 14-1 at PageID 126-27.)[1]   On February

26, 2003, the State filed notice of its intent to seek enhanced punishment.   (Not. of Intent to Seek

Enhanced Punishment, *id.*, ECF No. 14-1 at PageID 128-29.)

A jury trial commenced in the Shelby County Criminal Court on June 21, 2004.   On June

21, 2004, the jury returned a guilty verdict against Robert Smith on the charge of second degree

murder.   (Trial Tr. 546, *id.*, ECF No. 14-7 at PageID 830.)[2]   Smith was subsequently sentenced

as a career offender to a term of imprisonment of sixty years.   (J., *State v. Smith,* No. 02-09026

(Shelby Cnty. Crim. Ct.), ECF No. 14-1 at PageID 161.)   The Tennessee Court of Criminal

Appeals ("TCCA") affirmed.   *State v. Smith*, No. W2005-00015-CCA-R3-CD, 2006 WL

3147056 (Tenn. Crim. App. July 3, 2006), *appeal denied* (Tenn. Nov. 3, 2006).

On March 13, 2007, Smith filed a *pro se* petition pursuant to the Tennessee

Post-Conviction Procedure Act, Tenn. Code Ann. §§ 40-30-101 to -122, in the Shelby County

Criminal Court.   (Pet. for Post Conviction Relief, *Smith v. State*, No. 02-09026 (Shelby County

Crim. Ct.), ECF No. 14-11 at PageID 915-27.)   After counsel was appointed to represent Smith,

an amended petition was filed on January 16, 2007.   (Am. Pet. for Post-Conviction Relief, *id.*,

ECF No. 14-11 at PageID 930-38.)   The State filed its response on November 1, 2007.   (Resp. of

State of Tenn. to Pet. for Post Conviction Relief, *id.*, ECF No. 14-11 at PageID 939.)   A second

amendment to the post-conviction petition was filed on February 14, 2008.   (2d Am. Pet. for

Post-Conviction Relief, *id.*, ECF No. 14-11 at PageID 940-50.)   Hearings on the post-conviction

---

[1] Robert Smith's brother, Albert Smith, was charged in a separate indictment, Case Number 02-09027, with facilitation of second degree murder.   (Order of Transfer, *id.*, ECF No. 14-1 at PageID 130; Mins., *id.*, ECF No. 14-1 at PageID 135-38.)   The two indictments were tried together.

[2] The jury also acquitted Alfred Smith on the charge of facilitation to commit second degree murder.   (*Id.* at 546-47.)

petition were held on February 14, 2008, May 15, 2008, and August 15, 2008. (02/14/2008 Post-Conviction Hr'g Tr., *id.*, ECF No. 14-13; 05/15/2008 Post-Conviction Hr'g Tr., *id.*, ECF No. 14-14; 08/15/2008 Post-Conviction Hr'g Tr., *id.*, ECF No. 14-15.) The post-conviction court denied relief on January 4, 2010. (Order Denying Pet. for Post-Conviction Relief, *id.*, ECF No. 14-11 at PageID 951-59.) The TCCA affirmed. *Smith v. State,* No. W2010-00305-CCA-R3-PC, 2011 WL 3912811 (Tenn. Crim. App. Sept. 7, 2011), *appeal denied* (Tenn. Jan. 13, 2012).

The TCCA summarized the evidence introduced at trial:

> The State presented witnesses who were present at the time when Anthony Dorsey Sr., was fatally shot by the defendant. Their accounts were, in the main, consistent as to the events concerning the shooting on October 4, 2002. Those individuals present during the offense and testifying for the State were: Anthony Dorsey, Jr., Lacotra Blair, Taneka Blair, Antoinette Dorsey, Marcus Stephen, Reginald Sanders, and Christine Sanders. Reginald Sanders was the victim's nephew. Christine Sanders was a neighbor who lived in the adjoining duplex to the victim and his family. The remaining witnesses were the victim's children.

> On October 3, 2002, two eleven-year-old boys engaged in a fight. They were Anthony Dorsey, Jr., the victim's son, and Travis Watt, the son of the defendant. On the next day, the boys had another encounter in which Travis Watt struck Anthony Dorsey, Jr., with a pipe, causing a knot and bleeding. The victim, Dorsey, Sr., was informed of this by his son, and he first reacted by saying that they would settle the matter with the school principal on the coming Monday. Anthony, Jr., had seen the defendant pick up Travis Watt and his younger brother after the October 4 fight and leave in a black car with a red stripe. The victim and Anthony, Jr., went in search of the defendant, but the search was unavailing and they returned home. Anthony, Jr., left with his cousin, Reginald, and they were later picked up by Marcus Stephen and his friend Marcus Hall, aka "Black." Hall was driving Marcus Stephen's car. In the interim, the defendant, accompanied by his brother, Albert Smith, and the defendant's two sons, Travis Watt and Marco, had gone to the victim's residence. The victim met the defendant in the victim's front yard where a discussion ensued. The group in Marcus Stephen's car arrived and walked toward the assembly in the yard. The defendant then pulled a handgun and grabbed Marcus Stephen, threatening to blow his head off. The defendant also ordered the group not to move. Reginald Sanders ran to the house, and the defendant pursued him. The victim followed and, on the porch, grabbed the defendant, restraining him from entering the residence. The victim and defendant struggled until the defendant freed his arm and began firing the gun. The victim

3

collapsed on the porch. The defendant then fell backward from the porch, still firing the gun. The defendant continued to fire the weapon as he regained his feet and ran to the car. The car, driven by Albert Smith, then sped away. Travis Watt sustained a bullet wound to the arm as they were escaping. He stated that he saw an individual emerge from the victim's house, shooting a weapon. Albert Smith stated that both Marcus Hall and Reginald Sanders were firing at their car as the defendant's group left the scene. None of the State's witnesses admitted to seeing anyone with a gun except the defendant.

Officer Ricky Davison of the Memphis Police Department crime response unit, testified that a .9 mm casing was found on the porch and another was found near the foot of the driveway. Three .32 caliber casings were found in the lawn in a straight line toward the street. No weapons were recovered, and no ballistic tests were performed.

Tara Jones testified that she dated Albert Smith in October 2002. Albert Smith had her car on October 4. When she saw her car several days later, it had bullet holes in the passenger side and the passenger window was broken out. On October 5, she had borrowed a car and taken the defendant and Albert Smith to attempt to rent a car. They were unsuccessful due to a faulty credit card. She then delivered the defendant and his girlfriend to a motel where they rented a room.

Dr. O.C. Smith, an expert in forensic pathology, assisted in the autopsy of the victim. The victim sustained a single gunshot wound that entered the right side of his chest and exited on the back side of the left chest. Powder burns and stippling on the victim's skin indicated that the shot was fired from a distance of two feet or less. The victim's death was a result of an intermediate gunshot wound to the chest and abdomen.

The jury, after being instructed on the elements of second degree murder and the lesser included offenses of voluntary manslaughter, reckless homicide, and criminally negligent homicide, returned a guilty verdict as to second degree murder.

*State v. Smith,* 2006 WL 3147056, at *1-2.

### B. Procedural History of Smith's § 2254 Petition

On June 6, 2012, Smith filed a *pro se* Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody. (§ 2254 Pet., *Smith v. Parris,* No. 2:12-cv-02436-STA-dkv (W.D. Tenn.), ECF No. 1.) In response to the Court's order (Order, *id.*, ECF No. 2), Smith filed

an *in forma pauperis* motion on June 14, 2012 (Appl. to Proceed in District Court Without Prepaying Fees or Costs (Short Form), *id.*, ECF No. 3). On June 15, 2012, the Court granted leave to proceed *in forma pauperis.* (Order, *id.*, ECF No. 4.) The Court issued an order on August 27, 2012, directing Smith to file an amended petition on the official form. (Order, *id.*, ECF No. 6.) Smith filed his Amended § 2254 Petition on September 10, 2012. (Am. § 2254 Pet., *id.*, ECF No. 7.) On November 5, 2012, the Court ordered Respondent, NWCX Warden Henry Steward, to file the state-court record and a response to the Amended § 2254 Petition. (Order, *id.,* ECF No. 8.)[3]

On December 20, 2012, Respondent filed his answer ("Answer") and the state-court record. (Answer, *Smith v. Parris,* No. 2:12-cv-02436-STA-dkv (W.D. Tenn.), ECF No. 13; Resp't's Not. of Filing, *id.*, ECF No. 14.)

On May 10, 2013, Respondent filed a motion asking that his Answer be construed as a motion for summary judgment. (Resp't's Mot. to Construe Answer as Mot. for Summ. J., *id.*, ECF No. 16.) On May 23, 2013, Smith filed a response in opposition to that motion. (Decl. of Pet'r in Opp'n to Resp't's Mot. to Construe Answer as Mot. for Summ. J., *id.*, ECF No. 18.) In that filing, Smith stated that he had not received the Answer, the state-court record, or the motion. (*Id.* at 1-2.) Also on May 23, 2013, Smith filed motions seeking a copy of the state-court record and the appointment of counsel. (Pet'r's Mot. to Obtain Copies, *Smith v. Parris,* No. 2:12-cv-02436-STA-dkv (W.D. Tenn.), ECF No. 19; Mot. for Appointment of Counsel, *id.*, ECF No. 20.) On May 29, 2013, Petitioner filed a motion seeking an extension of time to respond to the summary judgment motion. (Pet'r's Mot. for Extending of Time, *id.*, ECF No. 22.) On June

---

[3] The Clerk is directed to substitute current NWCX Warden Mike Parris for Henry Steward as respondent. *See* Fed. R. Civ. P. 25(d).

4, 2013, Respondent filed a motion in opposition to Petitioner's motion for copies in which he represented that those documents had previously been served on Smith and that the motion "would impose unnecessary copying and mailing costs on the respondent." (Resp't's Resp. in Opp'n to Pet'r's Mot. for Copies, *id.*, ECF No. 23.) On June 12, 2013, Smith filed a declaration in further support of his motion for copies. (Decl. of Pet'r in Supp. of Mot. for Copies, *id.*, ECF No. 24.) On August 1, 2013, Smith filed another motion for an extension of time to respond to the summary judgment motion. (Pet'r's 2d Mot. for Extension of Time and Mot. to Compel, *id.,* ECF No. 25.) On September 3, 2013, Smith filed a response in opposition to the motion to construe the Answer as a motion for summary judgment. (Pet'r's Resp. to Resp't's Mot. to Construe Answer as Mot. for Summ. J., *id.*, ECF No. 26.) On September 11, 2013, the Clerk docketed a letter from Smith advising that he had filed an inmate request at his prison asking for verification that his legal mail had been received. (Letter, *id.*, ECF No. 27.) On October 3, 2013, Respondent filed a notice that he had re-served the Answer and Notice of Filing of Documents on Petitioner. (Resp't's Not. of Re-Service of Resp't's Answer and Not. of Filing, *id.*, ECF No. 29.)

The Court issued an order on October 24, 2013, that denied the motion to construe the Answer as a motion for summary judgment, denied as moot Petitioner's motion for copies of the state-court record, denied Petitioner's motions for an extension of time to respond to the summary judgment motion as moot, and extended Petitioner's time to reply to the Answer. (Order, *id.*, ECF No. 32.) On December 27, 2013, Smith filed his Reply to Respondent's Answer ("Reply"). (Reply, *id.*, ECF No. 35.)

## II.  PETITIONER'S FEDERAL HABEAS CLAIMS

In his Amended § 2254 Petition, Smith raises the following issues:

1.  "Insufficient Evidence" (Am. § 2254 Pet. at PageID 48, *id.*, ECF No. 7; *see also id.* at PageID 49-55);

2.  "Actual Innocence of the Non-Capital Persistent and Repeat Violence Officer Sentenc [sic]" (*id.* at PageID 56; *see also id.* at PageID 56-60); and

3.  "Ineffective Assistance of Counsel" (*id.* at PageID 60; *see also id.* at PageID 60-72).

## III.  THE LEGAL STANDARD

The statutory authority for federal courts to grant habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").   A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."   28 U.S.C. § 2254(a).

### A.  Waiver and Procedural Default

Twenty-eight U.S.C. § 2254(b) and (c) provide that a federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has exhausted available state remedies by presenting the same claim sought to be redressed in a federal habeas court to the state courts.  *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).   The petitioner must "fairly present"[4] each claim to all levels of state court review, up to and including

---

[4] For a claim to be exhausted, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made."

the state's highest court on discretionary review, *Baldwin v. Reese*, 541 U.S. 27, 29 (2004), except where the state has explicitly disavowed state supreme court review as an available state remedy, *O'Sullivan v. Boerckel*, 526 U.S. 837, 847-48 (1999). Tennessee Supreme Court Rule 39 eliminated the need to seek review in the Tennessee Supreme Court in order to "be deemed to have exhausted all available state remedies." *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003); *see Smith v. Morgan*, 371 F. App'x 575, 579 (6th Cir. 2010) (the *Adams* holding promotes comity by requiring that state courts have the first opportunity to review and evaluate claims and by mandating that federal courts respect the duly promulgated rule of the Tennessee Supreme Court that recognizes that court's law and policy-making function and its desire not to be entangled in the business of simple error correction).

The procedural default doctrine is ancillary to the exhaustion requirement. *See Edwards v. Carpenter*, 529 U.S. 446, 452-53 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred from seeking federal habeas review. *Wainwright v. Sykes*, 433 U.S. 72, 87-88 (1977); *see Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991) (a federal habeas court will not review a claim rejected by a state court "if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment"). If a claim has never been presented to the state courts, but a state court remedy is no longer available (*e.g.*, when an applicable statute of limitations bars a claim), the claim is technically exhausted, but procedurally barred. *Coleman*, 501 U.S. at 732;

_____

*Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam). Nor is it enough to make a general appeal to a broad constitutional guarantee. *Gray v. Netherland*, 518 U.S. 152, 163 (1996).

*see Hicks v. Straub*, 377 F.3d 538, 551 (6th Cir. 2004) (the procedural default doctrine prevents circumvention of the exhaustion doctrine).

Under either scenario, a petitioner must show "cause" to excuse his failure to present the claim fairly and "actual prejudice" stemming from the constitutional violation or, alternatively, that a failure to review the claim will result in a fundamental miscarriage of justice. *Schlup v. Delo*, 513 U.S. 298, 322 (1995); *Coleman*, 501 U.S. at 750. The latter showing requires a petitioner to establish that a constitutional error has probably resulted in the conviction of a person who is actually innocent of the crime. *Schlup*, 513 U.S. at 321; *see House v. Bell*, 547 U.S. 518, 536-39 (2006) (restating the ways to overcome procedural default and further explaining the actual innocence exception).

"There is no constitutional right to an attorney in state post-conviction proceedings. Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings." *Coleman*, 501 U.S. at 752 (citations omitted). Until recently, then, a habeas petitioner could not obtain relief when a claim was barred by procedural default due to the ineffective assistance of post-conviction counsel.

In 2012, the Supreme Court issued its decision in *Martinez v. Ryan*, 132 S. Ct. 1309, 1320 (2012), which recognized a narrow exception to the rule stated in *Coleman* "[w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding . . . ." In such cases, "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance of counsel if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Id.* at 1320. The Supreme Court emphasized that "[t]he rule of *Coleman* governs in all but the limited

circumstances recognized here. . . . It does not extend to attorney errors in other proceedings beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial . . . ." *Id.* at 1320. The requirements that must be satisfied to excuse a procedural default under *Martinez* are as follows:

> (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law requires that an "ineffective assistance of trial counsel [claim] ... be raised in an initial-review collateral proceeding."

*Trevino v. Thaler*, 133 S. Ct. 1911, 1918 (2013).

*Martinez* arose under an Arizona law that did not permit ineffective-assistance claims to be raised on direct appeal. In its subsequent decision in *Trevino*, 133 S. Ct. at 1921, the Supreme Court extended its holding in *Martinez* to states in which a "state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal . . . ." Thus, the decision in *Trevino* modified the fourth requirement stated by *Martinez* for overcoming a procedural default. The decisions in *Martinez* and *Trevino* apply to Tennessee prisoners. *Sutton v. Carpenter*, 745 F.3d 787, 789 (6th Cir. 2014).

## B.     Merits Review

Section 2254(d) establishes the standard for addressing claims that have been adjudicated in state courts on the merits:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1)      resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)      resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).   The petitioner carries the burden of proof for this "difficult to meet" and "highly deferential [AEDPA] standard," which "demands that state-court decisions be given the benefit of the doubt." *Cullen*, 131 S. Ct. at 1398 (internal quotation marks and citations omitted).[5]

Review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. *Cullen*, 131 S. Ct. at 1399.   A state court's decision is "contrary" to federal law when it "arrives at a conclusion opposite to that reached" by the Supreme Court on a question of law or "decides a case differently than" the Supreme Court has "on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).[6]   An "unreasonable application" of federal law occurs when the state court "identifies the correct governing legal principle from" the Supreme Court's decisions "but unreasonably applies that principle to the facts of the prisoner's case." *Williams,* 529 U.S. at 412-13.   The state court's application of clearly established federal law must be "objectively unreasonable." *Id.* at 409. The writ may not issue merely because the habeas court, in its independent judgment, determines

---

[5] The AEDPA standard creates "a substantially higher threshold" for obtaining relief than a *de novo* review of whether the state court's determination was incorrect. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

[6] The "contrary to" standard does not require citation of Supreme Court cases "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam); *see Mitchell v. Esparza*, 540 U.S. 12, 16 (2003) (same); *Treesh v. Bagley*, 612 F.3d 424, 429 (6th Cir. 2010) (same).

that the state court decision applied clearly established federal law erroneously or incorrectly. *Renico v. Lett*, 559 U.S. 766, 773 (2010); *Williams*, 529 U.S. at 411. "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

There is little case law addressing the standard in § 2254(d)(2) that a decision was based on "an unreasonable determination of facts." However, in *Wood v. Allen*, 558 U.S. 290, 301 (2010), the Supreme Court stated that a state-court factual determination is not "unreasonable" merely because the federal habeas court would have reached a different conclusion. In *Rice v. Collins*, 546 U.S. 333, 341-42 (2006), the Court explained that "[r]easonable minds reviewing the record might disagree" about the factual finding in question, "but on habeas review that does not suffice to supersede the trial court's . . . determination."[7]

"Notwithstanding the presumption of correctness, the Supreme Court has explained that the standard of § 2254(d)(2) is 'demanding but not insatiable.'" *Harris v. Haeberlin*, 526 F.3d 903, 910 (6th Cir. 2008) (quoting *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005)). "Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review.'" *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). A state court adjudication will not be

---

[7] In *Wood*, 668 U.S. at 293, 299, the Supreme Court granted certiorari to resolve whether, to satisfy § 2254(d)(2), a petitioner must establish only that the state-court factual determination on which the decision was based was "unreasonable," or whether § 2254(e)(1) additionally requires a petitioner to rebut a presumption that the determination was correct with clear and convincing evidence. The Court ultimately found it unnecessary to reach that issue. *Id.* at 300-01, 304-05. In *Rice*, 546 U.S. at 339, the Court recognized that it is unsettled whether there are some factual disputes where § 2254(e)(1) is inapplicable.

overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding. *Ayers v. Hudson*, 623 F.3d 301, 308 (6th Cir. 2010); *see Hudson v. Lafler*, 421 F. App'x 619, 624 (6th Cir. 2011) (same).

## IV. ANALYSIS OF PETITIONER'S CLAIMS

### A. Sufficiency of the Evidence

In Claim 1, Smith argues that the evidence is insufficient to sustain his conviction for second degree murder. (§ 2254 Pet. at PageID 48-56.) "Specifically, he avers that the evidence presented was insufficient to establish that he (1) knowingly killed the victim, (2) was aware that his conduct was reasonably certain to cause the result; or (3) knew that his actions were reasonably certain to cause the victim's death." (*Id.* at PageID 48-49.) Smith also argues that the ballistics evidence indicates that his "adversaries had readily available weapons and actually used those weapons," which "is a fact that bolsters the theories of defense (self defense or a lesser included offense)." (*Id.* at PageID 50.) According to Smith, the evidence is only sufficient to support a conviction for voluntary manslaughter. (*Id.* at PageID 51-52.)

On direct appeal, Smith challenged the sufficiency of the evidence. (Br. of the Appellant, Robert Smith, at 2, 22-34, *State v. Smith,* No. W2005-00015-CCA-R3-CD (Tenn. Crim. App.), ECF No. 14-8.) The TCCA rejected that issue on the merits, reasoning as follows:

> When reviewing a sufficiency challenge on appeal, the standard is "whether, considering the evidence most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002). After a verdict of guilt, the burden shifts to the defendant to demonstrate why the evidence is insufficient to support the verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000). On appeal, the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom. *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000). Questions concerning the credibility of witnesses, the weight and value of the evidence, and

13

all factual issues raised by the evidence are resolved by the trier of fact, and the reviewing court does not re-weigh or re-evaluate the evidence. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

. . . .

In his appeal, the defendant concedes that homicide was proven but contends that the evidence was insufficient to support a knowing killing as required for second degree murder. Second degree murder is a "knowing killing of another." T.C.A. § 39-13-210(a)(1) (1997). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result[.]" T.C.A. § 39-11-106(a)(20) (1997).

The defendant contends that the evidence was only sufficient to support voluntary manslaughter, criminally negligent homicide, or reckless homicide.

"Voluntary manslaughter is the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." T.C.A. § 39-13-211(a) (2006).

Criminally negligent homicide is criminally negligent conduct which results in death. T.C.A. § 39-13-212(a) (2006). The culpable mental state is defined as follows:

"Criminal negligence" refers to a person who acts with criminal negligence with respect to the circumstances surrounding that person's conduct or the result of that conduct when the person ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

T.C.A. § 39-11-302(d) (2006).

"Reckless homicide is a reckless killing of another." T.C.A. § 39-13-215(a) (2006).

"Reckless" refers to a person who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from

the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

T.C.A. § 39-11-302(c) (2006).

Whether the defendant's acts constitute a knowing killing (second degree murder) or, alternatively, a lesser offense is a question of fact for the jury. *See State v. Johnson*, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995). The degree of homicide is for the jury to decide in light of all of the facts in the case. *State v. Keels*, 753 S.W.2d 140, 143 (Tenn. Crim. App. 1988). Intent can seldom be proven by direct evidence but may be deduced or inferred by a jury from the character of the assault, the nature of the act, and the circumstances of the case in evidence. *State v. Inlow*, 52 S .W.3d 101, 105 (Tenn. Crim. App. 2000).

In the present case, the jury was presented with evidence that the defendant stated to the victim that he would kill on behalf of his son. During the initial confrontation, the victim remained calm and attempted to communicate with the defendant. The defendant grabbed Marcus, the victim's son, and placed the gun to his head while threatening to shoot him. The victim was unarmed at all times. The defendant attempted to enter the victim's residence with the weapon drawn until he was pulled back by the victim. The defendant shot the victim at close range and continued firing the weapon after falling from the porch and during his retreat to the car.

There was evidence which strongly indicated that shots were fired at the defendant's vehicle and its occupants. However, no witness stated that these shots were fired until after the victim was fatally wounded and the defendant's group was escaping the scene.

The degree of homicide was strictly within the province of the jury. The jury clearly rejected the lesser offenses. Our review, therefore, is merely to determine whether the evidence presented was sufficient to justify the conviction for second degree murder. We conclude that the evidence was sufficient and affirm the judgment of conviction.

*State v. Smith,* 2006 WL 3147056, at *2-3 (additional paragraph break added for clarity).

In *Jackson v. Virginia*, 443 U.S. 307, 324 (1979), the Supreme Court held that, "in a challenge to a state criminal conviction brought under 28 U.S.C. § 2254—if the settled procedural prerequisites for such a claim have otherwise been satisfied—the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact

could have found proof beyond a reasonable doubt." This standard requires a federal district court to examine the evidence in the light most favorable to the State. *Id.* at 326 ("a federal habeas corpus court faced with a record of conflicting facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution"). The State is not required "to rule out every hypothesis except that of guilt beyond a reasonable doubt[.]" *Id.* at 326. "[I]t is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Cavazos v. Smith*, 132 S. Ct. 2, 3 (2011) (per curiam). Credibility determinations are reserved for the trier of fact and are "generally beyond the scope of habeas review." *Moreland v. Bradshaw*, 699 F.3d 908, 918 (6th Cir. 2012) (internal quotation marks and alteration omitted), *cert. denied sub. nom Moreland v. Robinson*, 134 S. Ct. 110 (2013). "[A] federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court may do so only if the state court decision was objectively unreasonable." *Cavazos*, 132 S. Ct. at 3 (internal quotation marks and citation omitted).

Although Smith refers to the standards governing review of habeas claims on the merits (*see* Am. § 2254 Pet. at PageID 53, *Smith v. Parris,* No. 2:12-cv-02436-STA-dkv (W.D. Tenn.), ECF No. 7), the Amended § 2254 Petition does not make clear the provision of § 2254(d) on which he relies.[8] Smith's argument that the TCCA's opinion failed to cite *Jackson v. Virginia* (Am. § 2254 Pet. at PageID 53, *Smith v. Parris,* No. 2:12-cv-02436-STA-dkv (W.D. Tenn.), ECF No. 7) is

---

[8] The confusion continues in Smith's Reply, which states that "[t]he Tennessee Court of Criminal Appeals' resolution of this claim did involve an unreasonable application of clearly established federal law or an unreasonable determination of the facts under *Jackson v. Virginia* . . . ." (Reply at 4, *id.*, ECF No. 35.)

irrelevant. Smith concedes that the TCCA cited Tennessee cases such as *State v. Smith,* 24 S.W.3d 274, 278-79 (Tenn. 2000), *State v. Carruthers,* 35 S.W.3d 516, 557-58 (Tenn. 2000), and *State v. Reid,* 91 S.W.3d 247, 276-77 (Tenn. 2002), each of which cited *Jackson* and applied the legal standard established in *Jackson*. Smith has not argued that the TCCA's reasoning or its result contradicts *Jackson. See supra* p. 11 n.6.[9]

Smith also has not established that the TCCA's decision was an unreasonable application of *Jackson* or that it was based on objectively unreasonable factual findings. For the reasons stated by the TCCA, the evidence at trial was sufficient for a rational jury to convict Smith of second degree murder.[10] Anthony Dorsey, Jr. ("Dorsey, Jr."), the victim's son, testified that, on

---

[9] Smith also states that "no where [sic] within the opinion does the [TCCA] make mention of, cite, or reference T.C.A. §39-13-201(a)(1)." (Am. § 2254 Pet. at PageID 53, *Smith v. Parris,* No. 2:12-cv-02436-STA-dkv (W.D. Tenn.), ECF No. 7.) Smith's point is unclear, and the provision cited by Smith does not exist. Tennessee Code Annotated § 39-13-201 states only that "[c]riminal homicide is the unlawful killing of another person, which may be first degree murder, second degree murder, voluntary manslaughter, criminally negligent homicide or vehicular homicide." Smith may be referring to Tennessee Code Annotated § 210(a)(1), which provides that second degree murder is "[a] knowing killing of another . . . ." If so, that provision was cited by the TCCA. *See State v. Smith,* 2006 WL 3147056, at *2.

[10] That the evidence might also have permitted the jury to convict Smith of a lesser included offense is irrelevant and contrary to the jury instructions. The jury was instructed first to determine whether Smith was guilty of second degree murder and, only if he was found not guilty of that offense, was the jury to consider voluntary manslaughter, reckless homicide and criminally negligent homicide, in that order. (Jury Instructions at 30-31, *State v. Smith,* No. 02-09026 (Shelby Cnty. Crim. Ct.), ECF No. 14-3 at PageID 234-35.) Smith's argument that the State was required to disprove a killing in a state of passion (Am. § 2254 Pet. at PageID 51, *Smith v. Parris*, No. 2:12-cv-02436-STA-dkv (W.D. Tenn.), ECF No. 7), is, therefore, inaccurate.

The Supreme Court's decision in *Mullaney v. Wilbur,* 421 U.S. 684 (1975), on which Smith relies, is of no assistance to him. (*See id.*) *Mullaney* involved a Maine statute that required a defendant charged with murder to prove that he acted "in the heat of passion on sudden provocation" in order to reduce the homicide to manslaughter. 421 U.S. at 684-85. The Supreme Court held that that statute violated the Due Process Clause, which requires that the State prove every element of a criminal offense beyond a reasonable doubt. *Id.* at 703-04. *Mullaney* does not stand for the proposition that, in order to convict a defendant for a more serious offense, the State must prove that he should not be convicted of any lesser included offenses.

October 3, 2002, he was attending Knight Road Elementary School. (Trial Tr. 15, *State v. Smith*, No. 02-09026 (Shelby Cnty. Crim. Ct.), ECF No. 14-4.)[11] Dorsey, Jr. testified to an encounter he had had with another boy, Travis Watt, on October 3, 2002:

> Well, I was walking home with some friends. Originally my next-door neighbors was my friends and my niece—I would walk home with them after school, and Travis was walking the same way we was. And I guess he thought I was scared of him because they say he a known bully, and he used to pick on people. But he guess he was just talking, and it ended up—he ended up hitting me in my mouth; and I was raised up to fight back, so I hit him back; and when he fell to the ground, he was talking and crying—talking about, "That's okay, tomorrow we're going to kill you," and everything like that. So I told him to do what he do and went to the house and told my father what happened.

(*Id.* at 18.) Dorsey, Jr. was aware that Watt went to the same school as he did, but he did not know Watt. (*Id.* at 17.) Dorsey, Jr. and his father did not take any actions against Watt that day. (*Id.* at 18.)

The next day, October 4, 2002, Dorsey, Jr. first saw Watt when he was walking home from school. (*Id.* at 19.) According to Dorsey, Jr., he turned around and saw Watt and his brother running across the street. (*Id.*) Dorsey, Jr. recalled that "I seen his brother around school, but I ain't never seen Travis." (*Id.* at 19-20.) Dorsey, Jr. testified to what happened next:

> After I turned around, I told my neighbor and my niece to keep on walking, and I took out my backpack and my shirt that I had on, and he came towards me crying talking about he had a pipe—the pipe just—I guess they had on long sleeves—it slid out their arm, and they had it in their hand. I said, "If you come to bring a pipe for me, you better use it then," and I fired on him—well, I hit him—punched him—him and his brother in the face. I just went to fighting him. Then his brother hit in my knee and my rib; but me, I was worried about Travis at the point. Then I tried to snatch the pipe from Travis, and it slipped out of my hand, and he hit me right here.
>
> Q. Is that what that knot is on your forehead?

---

[11] Some of the witnesses refer to Dorsey, Jr. as "D.J."

A.     Yes, ma'am.

(*Id.* at 20.)  Dorsey, Jr. did not have a weapon.  (*Id.*)  He testified that he bled when he was hit.  (*Id.* at 21.)  According to Dorsey, Jr., when he got hit on the head, "I didn't know it at first until the blood started running down my face.  I was still fighting at the moment."  (*Id.*)  At the time, Dorsey, Jr.'s niece and next-door neighbor "were still walking."  (*Id.*)  He testified that "I told them to walk and don't turn around.  I told them to keep on walking . . . [b]ecause they didn't need to see that."  (*Id.*)  After the fight on October 4, Dorsey, Jr. testified that Travis Watt

> went the other way down the street.  His daddy had pulled up in a black car with a
> red stripe on it and told him and Travis—Travis and his little brother hopped in the
> car, and they went—drove off.  I seen Mr. Smith's face real good.  He was red,
> bald-headed, and had an earpiece in his ear hooked onto his cell phone.

(*Id.* at 25-26.)

Dorsey, Jr. went home with blood on his head.  (*Id.* at 22.)  When he arrived home, his father and his sisters, Lacotra Blair and Taneka Blair, were present.  (*Id.*)  Reginald Sanders and Marcus Stephen were not present.  (*Id.*)  The victim was fixing a sink.  (*Id.*)  Dorsey, Jr. stopped to speak to his father and then went into the bathroom.  (*Id.*)  Dorsey, Jr. testified that "I went to the bathroom and cleaned off my forehead, and he told me, 'Don't worry about it.  We'll settle all of it on Monday.'  It was a Friday, and told us, 'We'll settle all of it on a Monday—on Monday at school.'  And he just went to fixin back on the sink."  (*Id.* at 23.)  The victim had asked Dorsey, Jr. who he had been fighting with, and Dorsey, Jr. replied, "The person I got to fighting with yesterday."  (*Id.*)  Dorsey, Jr. told his father that he did not know the other boy's name but that he knew them.  (*Id.*)  His father replied, "Okay, we'll settle all of it on Monday at school."  (*Id.*)

Subsequently, the victim decided to go looking for the boy. (*Id.* at 23-24.) Dorsey, Jr. explained that "my father wanted to speak to Travis' father." (*Id.* at 24.) At first they went on foot and, later, they took the car. (*Id.*) Dorsey, Jr. did not know where Travis Watt lived. (*Id.*) Dorsey, Jr. testified as follows:

> Q. Before you left the house with your daddy to go look for Travis Watt, did your dad get a gun?
>
> A. No, ma'am.
>
> Q. Did you get a gun?
>
> A. No, ma'am.
>
> Q. Did your daddy own a gun?
>
> A. No, ma'am.
>
> Q. Did anybody in that house own a gun?
>
> A. No, ma'am.

(*Id.*) Dorsey, Jr. and his father did not find Travis Watt, and they returned home. (*Id.*)

Subsequently, Dorsey, Jr.'s brother, Marcus Stephen, arrived at the house, and Dorsey, Jr. told him what had happened and described the car that Travis Watt and his brother had gotten into. (*Id.* at 26.) Stephen said that he had seen a car exactly like that but, when they found it, Dorsey, Jr. told his brother that that was not the car. (*Id.* at 25, 26-27.) While Stephen and Dorsey, Jr. were out, they picked up Dorsey, Jr.'s cousin, Reginald Sanders, and Stephen's friend, Black, who were walking back from the store. (*Id.* at 27.) Dorsey, Jr. described Black as "a family friend." (*Id.* at 28.) According to Dorsey, Jr., Stephen, Sanders and Black did not have guns. (*Id.*) Dorsey, Jr. had never seen a gun in Stephen's car. (*Id.*)

While they were out, Stephen and Dorsey, Jr. called Lacotra Blair, who told them that Robert Smith was at their house. (*Id.* at 27.) When they arrived home, Robert Smith was talking to the victim "[b]y the sidewalk in the driveway." (*Id.* at 29.) Dorsey, Jr. testified that "[m]y father wasn't yelling, but Mr. Smith was." (*Id.*) In response to what Robert Smith was saying, Dorsey, Jr. replied:

> I don't know. I just—it wasn't—I just wasn't listening to him. I just heard a lot of yelling, though. I didn't know a particular reason why they—but he was talking—he was talking about he went to the Penal Farm before. He just got out, and he don't mind going back for his boy.

(*Id.* at 29-30.) In response, the victim "was just standing there because he had a towel over his shoulder—he had—to fix the sink. He was still working on it. He said, 'Man, I don't care where you've been. I didn't ask you all that.' And Mr. Smith kept on running—running from the mouth." (*Id.* at 30.)

By that time, Dorsey, Jr. and the others had gotten out of Stephen's car. (*Id.*) Dorsey, Jr. testified to what happened next:

> We had walked toward the—towards the sidewalk. Mr. Smith looked at us and pulled out a gun and grabbed my brother Marcus Stephens by the shirt and put the gun towards his head at the time. And then I—at the moment, my little brother—my little brother, J.D., who was one, he was right in between my father and Mr. Smith, and I had grabbed my little brother and ran in the house. My cousin, Reginald, was seeing my sister Taneka—Taneka Blair in the door, and she had just got through having a baby, so he ran in the house after her because she was in the doorway. And Mr. Smith let go of my brother and went to chasing after Reginald. And he—I think he stuck like the tip of his foot in the door, and my dad had popped him against the window and held him like that from the back and was telling him, "I can't let you go in my house. I got kids and grandchildren in there." And they went back to tussling for the gun, and Mr. Smith snatched it back and shot my daddy twice.
>
> And then after that, Robert had walked back and tripped off the porch, and he was still shooting at the time. He had just tripped off the porch, and just bullets were just firing everywhere.

21

(*Id.* at 31.)   Dorsey, Jr. explained that Robert Smith "was out of control shooting—just moving his hand everywhere just pulling the trigger."   (*Id.* at 31-32.)   Dorsey, Jr. heard "[a]bout seven or eight" shots.   (*Id.* at 32.)

According to Dorsey, Jr., Robert Smith pulled out a gun after he, Stephen, and Sanders had gotten out of the car.   (*Id.*)   Dorsey, Jr. testified that Robert Smith "pulled out a gun and went straight to my oldest brother Marcus Stephen and grabbed him by the shirt and put the gun to his head[.]"   (*Id.*)   Robert Smith said to Stephen that "I'll blow your mother-fucking head off." (*Id.*)   Dorsey, Jr. reiterated that the victim, Stephen and Black were not armed.   (*Id.*)   At the time, Sanders had run into the house after Dorsey, Jr.'s sister.   (*Id.* at 33.)   After Dorsey, Jr. got his little brother, he ran into the living room and sat behind the couch with his brother.   (*Id.*)

After Robert Smith fell, he was "[o]n his back facing the front of the house."   (*Id.*) Dorsey, Jr. testified that Robert Smith "was still shooting.   When he tried to get up, he was constantly slipping.   And I didn't see anything after that.   I had closed my eyes and held my little brother."   (*Id.*)   Apart from Dorsey, Jr., his little brother, Sanders and Taneka, everyone else was outside.   (*Id.*)   Dorsey Jr. testified that, after the shooting, "I heard a tire—a car pulling off—like the tires peeling off going down the street."   (*Id.* at 33-34.)   He also "heard glass busting at the time, too."   (*Id.* at 34.)

Dorsey, Jr. recalled that an ambulance arrived and took his father to The Med.   (*Id.*) Dorsey, Jr.'s mother took him to LeBonheur Childrens' Hospital to get seven stitches in his forehead.   (*Id.*)   They then returned to The Med, where his father subsequently died.   (*Id.*)

That evening, the police got Dorsey, Jr. from The Med and took him to the police station for questioning. (*Id.* at 34-35.) A couple of weeks later, a detective came to his house to show him a photo lineup. Dorsey, Jr. identified Robert Smith. (*Id.* at 35.)

Dorsey, Jr. testified that Robert Smith had come to his house that night in "a gold four-door car." (*Id.* at 36.) According to Dorsey, Jr., "[w]hen I got out [of Stephen's car], Robert, Albert, and Travis was standing on the sidewalk. Robert was closest to my dad." (*Id.* at 36-37.) "Travis and Albert were just standing there" on the sidewalk. (*Id.* at 37.) Travis was crying. (*Id.*)

Dorsey, Jr. testified that nobody had threatened Travis Watt at the victim's house that day. (*Id.* at 42.) Neither Travis Watt nor Robert Smith apologized to him. (*Id.*) Dorsey, Jr. testified that he did not shoot Travis Watt in the elbow and that he did not know who did. (*Id.* at 47.) Robert Smith was the only person that Dorsey, Jr. knew had a weapon that day. (*Id.* at 47-48.) The victim did not shoot Travis Watt. (*Id.* at 48.)

On cross-examination by Robert Smith's attorney, Dorsey, Jr. reiterated that Reginald Sanders was not present when he first got home on October 4. (*Id.*) Dorsey, Jr. admitted that he stayed behind to fight Travis Watt on October 4. (*Id.* at 49-50.) He admitted that "I was raised up to fight back. I wasn't raised up to just let somebody hit me." (*Id.* at 50.) Dorsey, Jr. also knew that it was not a good idea to turn his back on his enemies, such as Travis Watt. (*Id.*)

Dorsey, Jr. reiterated that, after he got home and told his father what had happened, his father first said they would deal with it on Monday but then went out to look for the boy who had assaulted him. (*Id.* at 50-51.) At the time, Dorsey, Jr. did not know Travis' name but his father told him "to go point him out for him so he can know who to talk to on Monday." (*Id.* at 51.)

23

Robert Smith arrived while Dorsey, Jr. and Stephen were out.  (*Id.*)  Dorsey, Jr. clarified that

Black had left the house with him and Stephen and that Black had been driving Stephen's car.  (*Id.*

at 53.)  They picked up Reginald Sanders on their way back.  (*Id.*)

According to Dorsey, Jr., "[w]hen we stepped out of the car, [Robert Smith] pulled his gun

out and went straight to my older brother, Marcus Stephen and put—grabbed him by the collar by

his shirt and put the gun to his face and told him—excuse my language—excuse my language.   He

said, 'I'll blow your mother-fucking head off.'"  (*Id.* at 54-55.)  Dorsey, Jr. grabbed his little

brother and ran into the house.  (*Id.* at 55.)  Dorsey, Jr. knew that Reginald Sanders came into the

house because "I seen him run in the house right after me."  (*Id.*)  Dorsey, Jr. and his little brother

were in the living room beside the front door.  (*Id.* at 56.)  Dorsey, Jr. testified that Robert Smith

"came after Reginald."  (*Id.*)   After Robert Smith came onto the porch, the victim "[p]ushed him

against the window and had him in a hold."  (*Id.* at 57.)  Dorsey, Jr. agreed that the victim came

up behind Robert Smith, pushed him up against the window and got him in a hold from behind.

(*Id.*)  He also agreed that Robert Smith got away from the victim and stepped back, or "jerked

back," away from him.  (*Id.* at 57-58.)  At that point, Robert Smith "already had [the pistol] out.

He just had it in his hand.   He just yanked back with the arm he had it in—he aimed back and just

shot twice."  (*Id.* at 58.)   After Robert Smith shot the victim twice (*id.*), Dorsey, Jr. testified that

> first he were walking backwards and fell off the porch.   At the same time, he was
> still shooting, and all of them had hopped in the car.   At this point, I was in the
> door tending to my father.   I seen him lying on the porch, and Robert and Albert
> and Travis fled the scene in the car.   I heard them peel out.   While he was
> shooting, I heard glass break.

(*Id.* at 58.)  Dorsey, Jr. testified that Robert Smith was the only one who was shooting that day,

that nobody else at the scene had a gun that he knew about, and that he was not aware that anybody

else had taken a shot. (*Id.* at 59.) Dorsey, Jr. testified that he did not shoot Travis Watt and he did not see anybody else shoot at him. (*Id.*)

On cross-examination by Albert Smith's attorney, Dorsey, Jr. testified that he was in sixth grade on October 4, 2002. (*Id.* at 60.) He did not know what grade Travis Watt was in but confirmed that, in his statement to the police, he had said that Watt was in fifth grade. (*Id.* at 60-62.) Dorsey, Jr. explained that "I heard he failed." (*Id.* at 62.) He admitted that he was bigger than Watt. (*Id.*) Dorsey, Jr. confirmed that he told the police that the fight on October 3, 2002 occurred when he was playing with Watt. (*Id.* at 63.) Dorsey, Jr. explained:

> We was just walking home from school. He was walking the same way. And when he went to talking, I went to talking back, and I was smiling at the time I was talking to him, but he had like a little mug on his face. I guess he didn't say anything. He came to me and elbowed me in the mouth, so I hit him back, and he fell on the ground.

(*Id.* at 64.) Dorsey, Jr. conceded that he hit Watt hard enough to knock him down that day. (*Id.* at 64-65.)

Dorsey, Jr. reiterated that the only person he saw with a gun was Robert Smith. (*Id.* at 65.) He conceded that, the day after the shooting, he had heard that Watt had been shot and that the car the Smiths had been riding in had bullet holes in it. (*Id.*) Dorsey, Jr. also admitted that he had heard that two kinds of bullet casings had been found in his yard. (*Id.*) He insisted, however, that "[a]ll I know is that Robert Smith is the only person that had a gun." (*Id.* at 66.)

Dorsey, Jr. acknowledged that, even though his father had said he would address the fight between the boys the next Monday, they went looking for Watt and his father. (*Id.*) Dorsey, Jr. explained that that was

[b]ecause he asked me did I know who he was. I said, "No." And he said, "You know[.]" I said, "No, sir." I said, "They must stay somewhere around here because he walked the same way I do."

(*Id.*)

Dorsey, Jr. testified that he did not get into the car with his father. (*Id.* at 67.) He got into a car with his brother, Marcus Stephen. (*Id.*) Black was driving. (*Id.*) While they were out, they saw Reginald Sanders and picked him up. (*Id.*) Dorsey, Jr. called his sister, Lacotra Blair, who told him that Robert Smith was at the house. (*Id.*) According to Dorsey, Jr., "I didn't know the rest of them was at the house until I got there." (*Id.*) The four were already heading home when Dorsey, Jr. spoke to Lacotra Blair. (*Id.* at 67-68.)

When they got to the house, Black pulled his car up in front of Albert Smith's car. (*Id.* at 68.) Dorsey, Jr. denied that he parked so close that Albert Smith would have to back up. (*Id.*) Everybody except Black got out of the car. (*Id.* at 68-69.) As they were walking toward the victim and Robert Smith, Robert Smith pulled out a gun. (*Id.* at 69.) Dorsey, Jr. testified as follows:

> Q. And he pulled out a gun because—
>
> A. I guess he thought we were going to do something to him.
>
> Q. Why would you think that?
>
> A. Because my brother, he kind of heavyset, and when we got out, I guess—I guess he just thought that were [sic] on payback or something, I guess.

(*Id.*) Dorsey, Jr. denied that they were walking fast or running. (*Id.*)

Dorsey, Jr. denied that there was a second boy at his house that day. (*Id.* at 71.) He testified that Watt was crying. (*Id.*) In response to whether he made Watt cry, Dorsey, Jr. replied, "Not that day besides when we got to fighting and he hit me in the head with the pipe the

day before that." (*Id.*) Dorsey, Jr. admitted that, the day before, "I hit him hard enough to make

him cry, I guess." (*Id.*) Dorsey, Jr. was taller than Watt but not heavier. (*Id.*) Watt was also

crying when he came over to Dorsey, Jr.'s house. (*Id.*) Dorsey, Jr. admitted that that was not the

first fight he had been in. (*Id.* at 72.)

Dorsey, Jr. further explained the circumstances of his fight with Watt on October 3, 2002:

> Q.     When you were playing with Travis on October the 3rd, you were
> playing rough with him, weren't you?
>
> A.     I wasn't playing rough.   He was just—I was talking at the time, but
> I was smiling while I was talking, but he had a little frown ono his face while he
> was talking.
>
> Q.     Well, what were you saying to him?
>
> A.     I said, "He ain't gonna do nothing; he's just talking and just running
> from the mouth."   I was smiling at the same time.
>
> Q.     You smile at him telling him he wasn't going to do anything?
>
> A.     Yes, sir.
>
> Q.     And then after all that happens, a fight ensues, and he ends up on the
> ground crying.   Is that right?
>
> A.     Yes, sir.   And he threatened me.
>
> Q.     While he was crying?
>
> A.     Yes, sir.

(*Id.*)

On redirect, Dorsey, Jr. testified that, after the fight on October 3, Watt had threatened him

by saying that he was going to kill him the next day. (*Id.* at 73.)

Dorsey, Jr. testified that his father had been 6'4" tall. (*Id.*) He was not heavyset, but he

was in shape. (*Id.*) Marcus Stephen was 5'9" or 5'10" and weighed more than two hundred

pounds.  (*Id.* at 73-74.)  Robert Smith and Albert Smith were taller than Marcus Stephen, taller than Reginald Sanders, and about the same height as the victim.  (*Id.* at 74.)

On recross-examination by Robert Smith's attorney, Dorsey, Jr. testified that the victim was not a heavyset man and that he did not remember that he was heavier than Robert Smith.  (*Id.* at 75-76.)

Lacotra Blair testified that she used to live on Brutonwood Cove with her father, Anthony Dorsey.  (*Id.* at 78.)  According to Lacotra Blair, the other people who lived with them were "[m]y sister, Taneka; my sister, Antoinette—my sister, Taneka, just had a two-month-old baby; my daughter; and my brother, Anthony, Jr."  (*Id.* at 79.)  Lacotra Blair's cousin, Reginald Sanders, also lived with them.  (*Id.*)

Lacotra Blair was home on October 4, 2002.  (*Id.*)  The victim, her sister, her sister's baby and Reginald were also home.  (*Id.* at 80.)  When Dorsey, Jr. came home, "[h]e was bleeding from the head.  His head was bust, and he was bleeding from the head."  (*Id.*)  Dorsey, Jr. was upset.  (*Id.*)  Lacotra Blair's daughter, who was in kindergarten, had been walking with Dorsey, Jr., and she was also upset.  (*Id.* at 80-81.)  Lacotra Blair was on the porch when her daughter and Dorsey, Jr. got home.  (*Id.* at 81.)  When her father saw Dorsey, Jr., "[h]e told D.J.—he said, 'Well, I'm going to take you to LeBonheur to get some stitches, and we're going to go to the school Monday and have a conference with'—I forgot the name of that principal, so whatever her name is."  (*Id.*)  Lacotra Blair testified that,

> [a]fter that, I think [Dorsey, Jr.] had got in the car with my dad, and they went riding around.  He went to show my dad where it happened at, and he was trying to see if the little boy that hit him and his daddy was anywhere around because he said that the little boy was with his daddy.  And they rode around, and they didn't see him.  And when he came back home, he made him a sandwich, and he started fixing on the kitchen sink.

(*Id.* at 81-82.)  Lacotra Blair estimated that the time when her father began working on the sink was approximately 4:00 or 4:30 p.m.  (*Id.* at 82.)

In response to whether her father grabbed a gun before he went driving around with Dorsey, Jr., Lacotra Blair testified, "No. My dad didn't own a gun.  He didn't own a gun.  He didn't want a gun in the house, period.  My daddy had seven kids in all—five kids, two step-kids, and two grandkids."  (*Id.*)  Lacotra Blair testified that the victim did not keep a gun in his car, explaining, "My daddy didn't have a gun, period."  (*Id.*)

Lacotra Blair testified that "[t]he little boy who my brother had got into it with, his dad, and his dad's brother" came to the house.  (*Id.* at 83.)  Before October 4, 2002, Lacotra Blair had never seen any of those people and had never heard their names.  (*Id.*)  According to Lacotra Blair,

> I was standing outside, and when—we stay in a cove, so they pulled down in the cove and turned around and parked directly in front of the house, and I went in the house, and I said, "Daddy"—because the kids who stay next door—Christine's kids—they was like, "That's the boy—that's the boy, and that's his daddy."  And I went in the house and I told my daddy—I said, "That man is outside.  And he got up from under the sink and threw his towel over his shoulder and he walked outside."

(*Id.*)  Lacotra Blair testified that her sister, her daughter, her little brother, Jamie, and her sister's daughter were home.  (*Id.* at 83-84.)  Dorsey, Jr. had left and gone to the store with Reginald Sanders.  (*Id.* at 84.)

The victim walked outside and met Robert Smith at the sidewalk.  (*Id.*)  In response to what Robert Smith was doing, Lacotra Blair testified that

> [h]e had got out of the car.  He had his hand in his right pocket, and my daddy asked him—he said, "Why would you give a child a pipe to hit another child with?  You supposed to be a grown man.  Why didn't you come and talk to me."  And

the whole time my daddy was asking him those questions, he had his hand in his pocket, and he was getting upset.  He said he'd been to the penitentiary and he'll go back; he just did seven years from killing a nigger, and—

. . . .

> A.    And he would kill again for his boy.   Those were his exact words.

(*Id.* at 84-85.)   Lacotra Blair testified that her father did not have a gun at that point and did not threaten to get a gun.   (*Id.* at 85.)

Lacotra Blair recalled that Robert Smith had gotten out of the rear passenger-side door. (*Id.*)   Robert Smith's "son was in the front seat, and his brother was driving."   (*Id.*)   Lacotra Blair testified that "the little boy, he wanted to stay in the car.   When his daddy told him, 'Get out the car, you ain't got to be scared.   You can get out the M.F. car.'   And he got out."   (*Id.*) According to Lacotra Blair, the boy got out of the car, "and he closed the door up real slow.   He was afraid.   The little boy was afraid."   (*Id.* at 86.)   Albert Smith, the driver of the car, got out, but "he never did come all the way up on the sidewalk.   He was standing like at the end of the car—like between the passenger and the driver' side.   He was like at the end, and he was just standing there."   (*Id.*)   Albert Smith did not say anything.   (*Id.*)

Robert Smith was yelling at the victim.   (*Id.*)   In response to what her father was saying, Lacotra Blair testified:

> He was just telling him that he should have been a grown man and came and talked to him.   They supposed to be parents.   He said, "Kids fight, but they be friends again the next day, why would you do that?"   He said, "How do you think I'm supposed to feel about you hitting my son in the head with a pipe," because see, from the beginning my daddy thought that the dad had help swing the pipe, but that ain't—that's not how it happened.

(*Id.*)   After that, "that's when [Robert Smith] started talking about he'd been to the penitentiary for killing a nigger, and he's go back for his boy.   That's when he started talking about that."   (*Id.* at 87.)

Dorsey, Jr., Reginald Sanders and Marcus Stephen arrived in Stephen's car.   (*Id.*)   In response to what happened next, Lacotra Blair testified:

> They got out of the car, and when they got out of the car, my cousin, Reginald, and my brother walked toward Robert—they started walking toward him.
>
> Q.   Did they grab him?
>
> A.   No.   They didn't get a chance to grab him because as they was walking toward him, he pulled a gun out of his pocket, and he grabbed my brother in the collar like this and put the gun in his face.   And at the same time he was doing that, my sister, Antoinette, was standing there on the side of him but behind him, and she said, "Daddy, he's lying, he did do that."   And he raised the pistol up like this (indicating) as if he was going to slap her; and my next-door-neighbor, Christine, pushed her back and told her to get back.
>
> And my daddy told my cousin, Reginald, and my brother, "Get back, I've got this.   We not going to do that," because they was angry.

(*Id.* at 87-88.)   Lacotra Blair testified that Reginald Sanders and Marcus Stephen were angry, but they did not have guns.   (*Id.* at 88.)   Nobody grabbed Robert Smith's son or threatened to grab him.   (*Id.*)   Nobody even went near him.   (*Id.* at 88-89.)   According to Lacotra Blair, "Our focus wasn't even [on] that little boy.   It was the man with the gun that told everybody, 'Don't move.'"   (*Id.* at 89.)

Lacotra Blair was asked who Robert Smith had told not to move, and she replied:

> It was—it was a lot of people outside.   Everybody that was outside in the yard, he just waived it around, and he said, "Don't move.   Don't nobody move." And when he said that, Reginald struck out running toward the house.   And then when Reginald struck out running to go in the house, [Robert Smith] ran behind him.

(*Id.*)   In response to whether Robert Smith had pointed the gun at the victim, Lacotra Blair replied, "He waived it around at everyone, but the only person he pointed it directly into his face was my brother.   That's the only one; he just put it in his face."   (*Id.*)

After Reginald Sanders ran to the house, he did not come back out.   (*Id.* at 90.)   Lacotra Blair testified that her father "didn't get a chance to make it in the house."   (*Id.*)   Lacotra Blair explained that,

> [w]hen [Robert Smith] ran in—tried to run in behind Reginald, he stepped one foot in the door, and my daddy told him, "I can't let you go in there.   I've got kids, and I've got grandkids in there," and he grabbed him.
>
> Q.      Who grabbed who?
>
> A.      My daddy grabbed him.
>
> Q.      Okay.   Where?
>
> A.      He had him like, you know, from the back.
>
> Q.      Okay.   Where was the gun at this point?
>
> A.      It was still in his hand.   He was—you know, they was tussling, and he snatched away from my daddy, and the first two shots that were fired hit my daddy right here and right there, and my daddy hit the porch.   After my dad hit the porch, Robert slipped backwards and fell off the porch.   He fell on his back.   But as he fell, he was trying to get up, and he was still shooting everywhere.
>
> Q.      What do you mean?
>
> A.      I mean, he was just shooting around, trying—at the same time he was trying to get up off the ground, he was still firing the gun?
>
> Q.      In what direction?
>
> A.      Everywhere—everywhere.   His arm was going everywhere because he was trying to get up at the same time.

(*Id.* at 90-91.)   At the time, Lacotra Blair was by the bushes that separated her house from the attached duplex.   (*Id.* at 91.)   Lacotra Blair testified that she could not say how many shots she heard that afternoon, "but it was a lot."   (*Id.* at 95.)   "Even after I left the bush and ran next door to Christine's house, I still was hearing gunshots."   (*Id.*)   In response to when she had run to Christine Sanders' house, Lacotra Blair testified:

> Okay.   The brother was at the end of the car, and he had kneeled down by the car, and he went in his pocket.   And I didn't know if he was going to get a gun out of his pocket.   He just pulled it lightly.   And when he went in his pocket, I ran. I struck out toward Christine's house and ran in her house.

(*Id.* at 95-96.)   Lacotra Blair continued to hear gunshots after she entered Christine Sanders' house.   (*Id.* at 96.)   She did not see the car drive away.   (*Id.*)

On cross-examination by Robert Smith's attorney, Lacotra Blair testified that, after Dorsey, Jr. "got his towel for his head, he left and went out and went to the store with Reginald." (*Id.* at 98.)   Lacotra Blair believed that Dorsey, Jr. and Reginald Sanders walked to the store and that they got a ride home with Marcus Stephen.   (*Id.* at 99.)   The only people in the car were Dorsey, Jr., Reginald Sanders and Marcus Stephen.   (*Id.* at 99-100.)   Lacotra Blair testified that the victim said to "stay back" after Robert Smith "had already put my brother in a choke hold and had the gun in his face."   (*Id.* at 102.)   According to Lacotra Blair, the victim "tells them to get back because they was walking toward him.   When they jumped out of the car, they was walking toward Mr. Smith pretty fast, and my daddy said, 'Stop.   I got this.   I'm going to handle this.'" (*Id.* at 103.)   Lacotra Blair clarified that "he did that in front of Reginald.   [Robert Smith] had already grabbed Marcus."   (*Id.*)   Lacotra Blair agreed that the victim held off Reginald Sanders by saying that "[w]e're not going to do that."   (*Id.*)

At that point, Reginald Sanders ran toward the house. (*Id.*) Robert Smith "let Marcus go and ran behind Reginald." (*Id.*) After Robert Smith got on the porch, the victim grabbed him from behind and there was a tussle. (*Id.* at 103-04.) Lacotra Blair denied that the gun had gone off during the tussle. She explained: "No. He had snatched away. He had pushed my daddy off of him and snatched away before he shot him." (*Id.* at 104.) Robert Smith shot the victim twice. (*Id.*) Lacotra Blair heard additional shots after the victim had been shot. (*Id.*)

According to Lacotra Blair, the police "told me they found two sets of bullets, and they asked me who was the other gunman." (*Id.* at 105.) "And I said, 'His brother had to have a gun because he went in his pocket, and he had to have a gun because we didn't have one. We didn't have nothing to defend ourselves with.'" (*Id.*) She testified:

> Q.     Nobody in that house owned a weapon, did they?
>
> A.     Nobody owned a gun—nobody.
>
> Q.     Nobody in that house would have a gun in any way, shape, or form.
>
> A.     Nobody. We gave them all rights to search the house everywhere.

(*Id.*)

On cross-examination by Albert Smith's attorney, Lacotra Blair reiterated that she only saw one gun, which was the gun Robert Smith used to shoot the victim. (*Id.* at 106-07.) The police had told her that there was a second gun. (*Id.* at 107.) In response to whether she assumed that Albert Smith had the second gun, Lacotra Blair testified: "Yeah, and I thought that was what Albert had." (*Id.*) Lacotra Blair reiterated that she did not see Albert Smith with a gun. (*Id.*) She also admitted that, shortly after the incident, she told the police that she saw Albert Smith pull something small and black out of his pocket. (*Id.* at 107.) She told the police that the second gun

34

"looked black" and that "I don't know what kind it was."  (*Id.* at 108.)  Lacotra Blair conceded that she had told the police that she saw Albert Smith with a gun.  (*Id.* at 109.)

Taneka Blair testified that she lived on Brutonwood Cove with her cousin and her two small children.  (*Id.* at 116.)  She had previously lived at that address with her father; her sister, Lacotra Blair; her sister, Antoinette Dorsey; her brother, Dorsey, Jr.; her cousin, Reginald Sanders; and her small child.  (*Id.* at 116.)  They had all lived together for about a year and a half.  (*Id.*)

Taneka Blair testified that she was at home on October 4, 2002.  (*Id.* at 116-17.)  When Dorsey, Jr. got home from school that day, Taneka Blair was in the kitchen talking to her father, who was fixing the sink.  (*Id.* at 117.)  In response to whether there was anything unusual about Dorsey, Jr.'s appearance that day when he got home from school, Taneka Blair testified that "[h]e had a big gash on his forehead, and he was bleeding."  (*Id.*)  Dorsey, Jr. told his father how he got that injury.  (*Id.*)  In response to whether the victim had been angry, Taneka Blair replied, "No, not really.  He was upset, but he wasn't real upset like I thought he would be."  (*Id.*)  The victim "talked to [Dorsey, Jr.] and told him they were going to go to the school on Monday and talk it over with whoever was involved but he was going to take him to LeBonheur and get his head stitched up."  (*Id.* at 117-18.)

Taneka Blair testified that her father did get the opportunity to take Dorsey, Jr. to LeBonheur.  (*Id.* at 118.)  The victim and Dorsey, Jr. went riding around "[b]ecause [the victim] said he wanted to talk to him about what had happened, but he didn't know where they lived at."  (*Id.*)  The victim did not bring a gun or any other weapon with him when he went out of the house.  (*Id.*)  According to Taneka Blair, neither the victim nor anybody else in the house kept a gun.  (*Id.*)

The victim and Dorsey, Jr. returned to the house, and then Dorsey, Jr. and Reginald Sanders went to the store. (*Id.* at 119.) Approximately five minutes later, Robert Smith, Albert Smith and Travis Watt pulled up in "a gold kind of a car." (*Id.*) Taneka Blair had never seen that car in the neighborhood before. (*Id.* at 119-20.) Taneka Blair testified that, when they pulled up, "I was in the house, and my older sister, Lacotra, came in and told my father what was going on. And so when he went out the door, I came out the door behind him." (*Id.* at 120.) Taneka Blair stood on the porch. (*Id.*)

The victim "walked to the side of the curb right here, and they parked the car right here." (*Id.* at 121.) Robert Smith got out on the back passenger side and told his son, who had been sitting in the front seat, to get out. (*Id.*) At first, the victim "was talking to [Robert Smith] as a grown man." (*Id.* at 122.) According to Taneka Blair, "He was asking him, you know, why would he get involved in a child's fight—he should of—he said, 'Kids fight every day. They'll be back friends the next day.' He said there wasn't no reason for him to get involved in their fight like that." (*Id.*) Robert Smith "said that he'd been to—he did seven years or something in the penitentiary, and he wasn't scared to go back and all that." (*Id.*) Watt "was just standing there behind his father." (*Id.*) At that time, nobody had a weapon. (*Id.* at 122-23.) Taneka Blair explained: "Didn't nobody have—he just had his hand in his pocket the whole time he was talking to my father because Christine shouted from her porch, 'Anthony, he's got his hands in his pocket.' And daddy was like, 'That's all right, I've got this.'" (*Id.* at 123.) Christine Sanders was their next-door neighbor, who initially had come down where the victim was and who later fled to her porch when Robert Smith pulled out a gun. (*Id.*) At the time, Taneka Blair; her

one-year-old brother, Jamie; her sister, Antoinette; her sister, Lacotra Blair; and Christine Sanders were all outside.   (*Id.*)

Taneka Blair testified that, at that point, her brother Marcus Stephen pulled up and parked directly in front of the car in which Robert Smith had been riding.   (*Id.* at 124.)   Dorsey, Jr. and Reginald Sanders were with Stephen.   (*Id.*)   They all got out of the car, and they started to approach Robert Smith.   (*Id.*)   According to Taneka Blair, "[M]y daddy put his hand up.   He said, "No, I'm handling this.   You all don't come over here.'"   (*Id.*)   She explained:

> Q.      How did they approach him?   Did they run at him and try to grab him?
>
> A.      No.   They didn't run at him.   They was just walking up.   After they got out of the car, they just, you know, was walking like this.
>
> Q.      Were they walking toward the little boy and trying to get him?
>
> A.      No.   They weren't walking toward the little boy.
>
> Q.      Were they walking, waiving guns?
>
> A.      No.   They didn't have any weapons.
>
> Q.      Were they waiving sticks?
>
> A.      No, ma'am.
>
> Q.      Were they cussing?
>
> A.      No, ma'am.
>
> Q.      Were they screaming?
>
> A.      No, ma'am.   He just jumped out of the car; and before he could say anything, my dad told him, "I've got this."
>
> Q.      He said that to whom?

A. He told that to Marcus. He said: "I got this—don't worry about it. I've got this." He didn't give him a chance to say anything."

(*Id.* at 124-25.)

Taneka Blair testified that, at that point, Robert Smith

grabbed Marcus in the collar and put the gun to his face, and he told him that, you know, he'll kill him. And so after that, everybody just started scattering. Reginald ran on the porch, and he pushed me in the house because I was standing—I was still standing on the porch. I didn't moved. After he pulled, I didn't run. He ran on the porch; he grabbed me and pulled me in the house.

(*Id.* at 125-26.) Taneka Blair continued:

And after that, Mr. [Robert] Smith ran behind him trying to come in the house behind him. And Reginald, you know, pushed the door, you know, so he couldn't get in. And at this time, I was on the floor, but you know, I was kind of looking. And I just—I heard my daddy say, "I can't let you go in my house." And after that, I didn't see anything else.

(*Id.* at 126.) The victim was on the porch when he said, "I can't let you go in my house." (*Id.*)

Reginald Sanders was in the house with Taneka Blair. (*Id.*) In response to whether Reginald Sanders went back out of the house, Taneka Blair replied, "After all of the commotion—after everything was over, he went back out of the house. He didn't go back out there when gunfire was being shot." (*Id.* at 127.) Taneka Blair did not see any gunfire, but she heard it. (*Id.*) In response to what it had sounded like, she testified: "Just loud. I heard—I heard two—it was a quick two, and then I just heard a whole lot afterwards." (*Id.*) Taneka Blair did not know how many shots were fired. (*Id.*) She did not know where Marcus Stephen was during the gunfire. (*Id.*)

In response to whether she saw anyone else in the car that Robert Smith and his son had gotten out of, Taneka Blair replied, "Yes. His brother Al. He was driving." (*Id.* at 128.) According to Taneka Blair, she saw Albert Smith get out of the car, but "[h]e was just standing

around outside the car.  But he didn't come around and confront my father or anything."  (*Id.*)

Taneka Blair did not remember whether Albert Smith had said anything.  (*Id.*)

After the gunshots, Taneka Blair heard "[j]ust a bunch of screaming and Christine hollering, 'Anthony, are you okay?—are you okay?'"  (*Id.*)  After checking on her daughter, Taneka Blair went outside, where she saw her father lying on the porch.  (*Id.*)

On cross-examination by Robert Smith's attorney, Taneka Blair testified that her father was going to take Dorsey, Jr. to LeBonheur "to see if he needed stitches because he wasn't sure at the time if he did."  (*Id.* at 129.)  Before the victim and Dorsey, Jr. went riding in the car, Dorsey, Jr. "had stopped the bleeding from his head.  It wasn't pouring out like it was at first."  (*Id.* at 130.)  After they returned to the house, Dorsey, Jr. and Reginald Sanders walked to the store.  (*Id.*)  They returned from the store in Stephen's car.  (*Id.*)  Taneka Blair did not know whether anyone was in the car after Dorsey, Jr., Reginald Sanders and Marcus Stephen got out.  (*Id.* at 130-31.)

Before Dorsey, Jr. returned from the store, Robert Smith arrived.  (*Id.* at 131.)  In response to whether the men were talking nicely at first, Taneka Blair replied, "Well, my father was talking to him nice.  He just wasn't—he wasn't responding.  He wasn't just saying anything at first."  (*Id.*)  Taneka Blair agreed that Robert Smith was listening to the victim.  (*Id.*)

Taneka Blair testified that, after Dorsey, Jr., Reginald Sanders and Marcus Stephen arrived, "[t]hey was walking up toward—they was walking behind my daddy.  Mr. Smith was in front of my daddy.  They was walking up behind my father."  (*Id.* at 132.)  In response to whether Reginald Sanders and Marcus Stephen were also approaching Robert Smith, Taneka Blair testified that "they didn't get to Mr. Smith . . . [b]ecause my father told them he was handling this;

they didn't need to say anything." (*Id.*) Travis Watt "was standing right beside his father by the car door by the front passenger side." (*Id.*) He was in front of the victim. (*Id.*) At that point, Robert Smith grabbed Marcus Stephen and pointed a gun to his head. (*Id.* at 133.) Reginald Sanders ran toward the house and took Taneka Blair inside, where she stayed on the floor. (*Id.*)

In response to whether she had seen Robert Smith come up onto the porch, Taneka Blair replied:

> No. I didn't see him come up on the—well, I did. He was in the front door. When I was on the floor, he was—Reginald was trying to keep him out the door. I didn't see his whole body come in the door, but I seen a piece of him.

(*Id.* at 133-34.) Taneka Blair agreed that Robert Smith had let Marcus Stephen go and came to the house "because he seen Reginald—I guess he seen Reginald take off, and I guess he took off behind him." (*Id.* at 134.) Reginald Sanders ran to the house to get Taneka Blair into the house. (*Id.*)

Taneka Blair was asked again what Reginald Sanders and Marcus Stephen had done when they arrived, and she replied:

> Q. And they jumped out of that car, right?
>
> A. No. They didn't jump out. They got out.
>
> Q. They got out. Were they moving slow or fast?
>
> A. No. I mean they weren't moving slow. It was at a regular pace.
>
> Q. Okay. So nobody was excited over the fact that Mr. Smith and his son was there?
>
> A. Yeah.
>
> Q. And that Anthony, Jr. had a knot on his head with blood that had just got stopped bleeding.

A.    Yeah.   They didn't get out trying to rush him.   I mean they got out.
Do you want me to show you how they got out?

Q.    No, ma'am.   That' okay.

(*Id.* at 137.)

Under questioning by Albert Smith's lawyer, Taneka Blair testified that, in 2002, Reginald Sanders was twenty-eight and Marcus Stephen was twenty-one or twenty.   (*Id.* at 138.)   Taneka Blair did not know anybody named Black.   (*Id.*)   At the time, Lacotra Blair had a boyfriend named Thomas, who was not present during the events at issue.   (*Id.* at 138-39.)

Taneka Blair testified that, when Dorsey, Jr., Reginald Sanders and Marcus Stephen got out of the car, they were standing within arm's reach of Robert Smith.   (*Id.* at 139.)

Antoinette Dorsey testified that she was sixteen years old and attended Manassas High School.   (Trial Tr. 141, *State v. Smith,* No. 02-09026 (Shelby Cnty. Crim. Ct.), ECF No. 14-5.) Antoinette Dorsey was fifteen years old on October 4, 2002.   (*Id.* at 142.)   At the time, she lived on Brutonwood Cove with her father, Anthony Dorsey, her sisters and her brother.   (*Id.*)

Antoinette Dorsey was home on October 4, 2002.   (*Id.* at 143.)   She had gone to school that day.   (*Id.*)   She did not attend the same school as Dorsey, Jr.   (*Id.*)   Antoinette Dorsey got home from school before Dorsey, Jr.   (*Id.*)   When she got home, her father and her sisters, Taneka Blair and Lacotra Blair, were there.   (*Id.*)   When Dorsey, Jr. got home, "[h]is head was busted."   (*Id.* at 144.)   Antoinette Dorsey testified that her father "was about to" take Dorsey, Jr. to the hospital, but first "[t]hey went walking to look for dude," meaning Robert Smith.   (*Id.*) Antoinette Dorsey accompanied her father and brother.   (*Id.* at 145.)   They did not find anybody, so they went back home.   (*Id.*)

Antoinette Dorsey testified that, "[a]fter we went back home, we were sitting there for awhile. And then they pulled up in the car—him, his brother, and his son. And him and my daddy started talking or whatever. And then my brother and them pulled up." (*Id.*) Antoinette Dorsey clarified that the first persons to pull up were Robert Smith, Albert Smith and Robert Smith's son. (*Id.* at 146.) Albert Smith was driving the car. (*Id.*) Robert Smith was in the back seat. (*Id.* at 147.) The other person in the car was Travis Watt. (*Id.*) Antoinette Dorsey did not know any of those people. (*Id.*) When they arrived, she was "[b]y the mailbox." (*Id.*) "Everybody that stayed in the neighborhood" was also outside. (*Id.* at 148.) The car that Albert Smith was driving was gold. (*Id.*) Antoinette Dorsey testified that, after the car pulled up, Robert Smith

> and my daddy started talking. And my brother and them had pulled up. And that's when he grabbed my brother by the collar and pointed a gun to him and acted like he was going to slap me with it, and that's when my cousin Scooter had ran into the house, and he ran behind my cousin, and that's when my daddy ran behind him, and they started tussling with the gun, and I guess he slipped back and shot my daddy twice, and he fell back, and that's when I was steady looking towards my daddy, and I didn't see nothing else after that.

(*Id.*) Scooter is Reginald Sanders. (*Id.*) He is Antoinette Dorsey's cousin. (*Id.* at 149.)

In response to who had pulled up with Reginald Sanders, Antoinette Dorsey replied that "I just saw my oldest brother, Marcus, and my little brother." (*Id.*) They did not hit anybody or try to hit anybody who was there. (*Id.*) They did not try to get to Travis Watt. (*Id.*) They did not have any weapons, and Antoinette Dorsey did not have any weapons. (*Id.*) The victim did not have a gun, and neither did Antoinette Dorsey. (*Id.*) Antoinette Dorsey did not run inside. (*Id.*) She was outside throughout the encounter. (*Id.*) After Reginald Sanders ran inside, Antoinette Dorsey ran towards a car that was parked nearby and bent down. (*Id.* at 150.) She was kind of

hiding behind the car. (*Id.*) Antoinette Dorsey testified that she could not see anything, but she clarified that she saw her father get shot. (*Id.*)

According to Antoinette Dorsey, "[t]hey was tussling with the gun. He slipped and shot him back twice. He fell backwards. He was still shooting." (*Id.*) The man who was still shooting was Robert Smith. (*Id.*) Antoinette Dorsey testified that Robert Smith "fell back off the porch when he was shooting." (*Id.* at 151.) After that, "[h]e was like crawling backwards shooting. You know, when you fall on your back, and you're still shooting trying to get up, that's what he was doing." (*Id.*) In response to how many shots she heard, Antoinette Dorsey replied, "I don't know. Too many." (*Id.*) Antoinette Dorsey could not tell the direction in which Robert Smith was shooting. (*Id.*) She testified that "[h]e was shooting everywhere." (*Id.*) The shooting finally stopped "when they drove off." (*Id.* at 153.)

There were a lot of people outside when the shooting was going on, including family members who were "scattered everywhere" and "[o]ur next-door neighbors and their kids." (*Id.* at 151-52.) Antoinette Dorsey did not see anybody else with a gun. (*Id.* at 152.)

On cross-examination by Robert Smith's attorney, Antoinette Dorsey testified that she had gone walking on the next street with her father and Dorsey, Jr. to look for Robert Smith. (*Id.* at 159.) When Robert Smith and his brother pulled up at their house on Brutonwood, Dorsey, Jr. was not home. (*Id.* at 160.) He had gone riding with Marcus Stephen and Reginald Sanders. (*Id.* at 160-61.) Antoinette Dorsey did not know whether those were the only three people in the car, but that was who she had seen get out of the car. (*Id.* at 161.) When Dorsey, Jr., Marcus Stephen and Reginald Sanders got out of the car, they stood "a little in front of the car." (*Id.*) They were right beside where the victim and Robert Smith were talking. (*Id.* at 161-62.)

43

Antoinette Dorsey testified that Robert Smith "had my brother by the collar pointing his gun to his head—acted like he was going to slap me with it, so Reginald ran in to the house."  (*Id.* at 162.)

At that point, Antoinette Dorsey ran behind the car (*id.* at 162-63), which was parked in the driveway (*id.* at 164).   Antoinette Dorsey was on the side of the car that was away from the front door.  (*Id.*)  She was looking at the porch through the car windows.  (*Id.* at 165.)

Antoinette Dorsey testified that she saw "the person with my daddy or whatever, and he just pulled—I guess he just slid back out and he shot my daddy and he fell back off the porch, and he started shooting."  (*Id.* at 164-65.)   Antoinette Dorsey testified that the men were tussling at first.  (*Id.* at 165.)   She saw them break away from one another somehow.  (*Id.*)   When he was shot, the victim was "right there by the door—right here by the window."  (*Id.* at 166.)   His back was up against the wall between the front door and the window.  (*Id.*)   Antoinette Dorsey denied that Robert Smith had stepped back a little bit before shooting the victim.   She testified:   "No, I said he snatched—kind of snatched—still was in front of him."  (*Id.* at 167.)

Antoinette Dorsey testified that she remembered giving a statement to the police on October 4, 2002.  (*Id.* at 168-69.)   She did not remember saying the things recorded in the statement and, in particular, did not recall saying that, when the shots were fired, she was sitting on her father's car.  (*Id.*)   Antoinette Dorsey did not recall what hand Robert Smith used to hold the gun.  (*Id.* at 171.)   She did not recall telling the police the gun was in Robert Smith's right hand.  (*Id.* at 171-72.)

On questioning by Albert Smith's attorney, Antoinette Dorsey testified that, when her brothers and cousin drove up, she did not see anyone get out from the driver's seat.  (*Id.* at 172.)   Neither Antoinette Dorsey's brothers, nor her cousin, was driving the car.  (*Id.*)   Antoinette

Dorsey knew someone named Black, who she described as "[a] friend of the family." (*Id.* at 173.) She did not know whether Black had been driving the car. (*Id.*) She explained that "I was paying attention to [Robert Smith] and my daddy." (*Id.*) The car was owned by Marcus Stephen, but Stephen was not driving the car that day. (*Id.*)

Marcus Stephen testified that he had previously lived with his father, Anthony Dorsey, on Brutonwood Cove beginning in 1996. (*Id.* at 174-75.) Stephen did not live on Brutonwood Cove on October 4, 2002, but he was at the house that day. (*Id.* at 175.) Stephen testified that he had gotten up at about 2:00 p.m. that day and "went there just to check on, you know—to ride through the cove, check on my family, and I seen my brother on the curb holding his head with a towel. So I asked him what was wrong with him. He said he got to fighting with this boy named Travis." (*Id.*) This occurred at about 3:00 p.m. (*Id.*) According to Stephen, "after that, I asked him—I was laughing and joking about the situation, you know what I'm saying, and I asked him where was Reginald, which was Scooter, my cousin." (*Id.* at 176.) Dorsey, Jr. told Stephen that Reginald Sanders was walking to the store, so Stephen told Dorsey, Jr. to get into the car so they could go to the store and get him. (*Id.*) Stephen continued:

> When we went and got Reginald, I asked Reginald what happened. Reginald was like, "I don't know. He got to fighting with this little boy," you know what I'm saying, so we headed back to the house. When I got to the house, Robert and his brother and his son was there talking to my dad.

(*Id.*) In response to whether he knew any of those people, Stephen testified that "I ain't never seen narry one of the[m] in my life." (*Id.*) They were in Stephen's car, and Black was driving. (*Id.* at 177.) Stephen did not know where Black was the day of the trial. (*Id.*)

When they pulled up at the house on Brutonwood Cove, the victim was "[s]itting right there in front of the house on the sidewalk by the driveway." (*Id.*) He was talking to Robert

Smith.  (*Id.*)  In response to whether the conversation between the men had been polite, Stephen

replied, "I don't know, really, because when I got out the car, I was walking toward them, and my

dad was like, 'Hold up, I got this,' you know—holding me back saying, 'I got this.'  Talking to

them, you know, trying to get the situation right."  (*Id.*)  Stephen testified that, when he got out of

the car, he was not waving a weapon and was not screaming.  (*Id.* at 178.)  In response to what he

had been saying, Stephen responded:

> Nothing.  I just got up, walked towards them, and then my dad's like,
> "Hold up, I got this," you know what I'm saying, and dude just looked at me and
> just pulled out his gun, came to me and said, "Don't [no] M.F. move."
> Came—grabbed me by my collar, put the gun in my face, said, "You move, I'll
> blow your mother head off," like that.  Then my little sister was like, "Leave my
> brother alone."  You know, "Get your hands off my brother," so he raised his hand
> like he was fixin' to smack her.

(*Id.*)  The sister who made that statement was Antoinette Dorsey.  (*Id.*)  Stephen continued:

> He raised his hand up like he was fixin' to smack my sister, and then
> Reginald took off running towards the house.  When Reginald took off running
> towards the house, he said, "No."  He said—
>
> Q.    Who said, "No"?
>
> A.    Robert.  Robert said, "No, get back here.  Where you
> going?"—know what I'm saying?  Ran up to him—ran after Reginald, and then
> about the time he got to the porch, my daddy had caught him, and they was
> wrestling and tussling, and I was running towards them, but the gun went off, so I
> ran like towards the driveway and slipped and fell.

(*Id.* at 178-79.)  Stephen clarified that he ran towards

> [m]y daddy's driveway.  So I ran towards the driveway, and I fell.  When I looked
> around, I seen Robert that's on the ground just shooting because he was trying to
> get up, you know.  He was getting up shooting, and then he got up, ran, jumped in
> the backseat, and they took off.  And then I ain't seen them no more since.

(*Id.* at 179.)

Stephen was asking what was going on when he fell, and he replied:

46

Him and my daddy was tussling. After the shots, I ran the other way and fell. After the shots—I was running—I was running toward Robert and my daddy to help my daddy, you know, but the shots went off, so I, you know, tried to duck and run and fell right here (indicating).

(*Id.* at 180.) At that point, Stephen

[l]ooked around—Robert was lying right here still shooting. Even though he'd fallen, he was trying to get up shooting. He got up and he ran and his car was right here. He jumped in the backseat, dude backed up, turned—you know, drove round my car, and that was that. I haven't seen them since.

(*Id.* at 180-81.)

Stephen testified that neither he nor Reginald Sanders had guns. (*Id.* at 181.) Stephen

was asked where Reginald Sanders was during these events, and he replied:

I don't know. Reginald ran up toward the house. Robert didn't want no one in the house, you know. Robert said, "Don't nobody move—nobody." When Reginald ran, I guess that made him ticked off. He went after him, and him and my daddy got to tussling, shots went twice.

(*Id.*) The victim was standing on the porch when he got shot. (*Id.*)

Robert Smith said, "Nobody move," "[w]hen he pulled his pistol out, period." (*Id.*)

According to Stephen, that did not happen at the same time that Robert Smith grabbed him. (*Id.*)

Stephen explained:

He pulled the pistol out of his pocket and said, "Don't nobody move," so he could get control of everybody. He then pulled me on my collar like this, put the gun in my face and said, "If you move, I'll blow your mother head off."

My sister walked up and said, "Get your hands off my brother." He raised his hand like he was going to smack her, then Reginald ran. When Reginald ran, that's when he ran after Reginald, and everything took off from there.

(*Id.* at 181-82.)

Stephen did not get in his car and follow Robert Smith after the shooting. (*Id.* at 182.) In

response to whether Black had ever gotten out of the car, Stephen replied:

I didn't see Black get out of the car, period.  I didn't see Black.  I wasn't paying any attention to Black.  I was focused on Robert and my dad.  I didn't know—I didn't even see the little boy behind Robert.  I seen Robert and Albert standing outside.

(*Id.*)  In response to whether he had shot Travis Watt, Stephen testified, "No, ma'am.  I didn't have a gun."  (*Id.*)  Stephen was asked whether he had seen anyone shoot at Albert Smith's car, and he testified that "I didn't see nobody have no gun but Robert.  Robert had the only gun.  The only gun I had seen was Roberts.  He had like a chrome 9 or a chrome 45.  I don't know which one it was."  (*Id.*)

Stephen was asked how many shots he heard, and he replied, "I really don't know."  (*Id.* at 183.)  In response to whether there had been more than one shot, Stephen testified:

Yeah.  It was more than one.  I heard the first two—that was at my daddy, and then they was like—he was just started shooting like—I guess he shot until his clip went out or he got in the back of the—once he jumped in the back of the seat, that's the last time I heard him shoot—once he jumped in the back of the seat and he left.

(*Id.*)  Stephen testified that he did not hear any other gunshots when Robert Smith jumped in the car "because he was still shooting once he jumped in the car."  (*Id.*)

When the police pulled up, they made Stephen move his car.  (*Id.*)  At the time, Black was standing in the yard with the family.  (*Id.*)

During cross-examination by Robert Smith's attorney, Stephen testified that he got to Brutonwood Cove at about 3:00 p.m.  (*Id.* at 184.)  Dorsey, Jr. was already there.  (*Id.*)  Stephen recalled that he "was standing on the curb holding his head with a towel."  (*Id.*)  Stephen did not see his father at that time.  (*Id.* at 185.)  When they picked up Reginald Sanders, Stephen "was asking Reginald what happened—you know what happened—you know what I'm saying—and Reginald was telling me that he got to fighting and he don't really know."  (*Id.*)

48

Black was driving Stephen's car (*id.*), and they went to the store to get Reginald Sanders (*id.* at 186). Stephen explained that "I went to pick him up because they said [Dorsey, Jr.] had got to fighting. I wanted to know some more facts about it." (*Id.*)

When they pulled up at the house, the gold car was already there. (*Id.*) Stephen admitted that they parked close enough to the gold car to block it in, so that "he had to go around me to get out. He had to back up and go around me to get out." (*Id.* at 187.) When Stephen started walking toward his father and Robert Smith, "Mr. Smith pulled out his gun on everybody." (*Id.*) At the time, Stephen was "[s]tanding right there in the same spot were [sic] my daddy told me, 'Don't move, I've got this.' My dad had his hand still on my stomach when Robert pulled out the gun." (*Id.* at 188.) Stephen continued:

> When Robert pulled his gun, my daddy backed backed. Robert comed to me, pulled me by my collar, said, "You move and I'll blow your mother head off. You're going to do something to my boy."
>
> You know, my little sister said: "Don't hit him. Get your hands off my brother. Get your hands off my brother."
>
> He was like, "Get back," he was fixin' to smack her or something. Reginald took off running, and he took off running behind Reginald.
>
> Q. So he just let you go?
>
> A. Yeah, because I guess Reginald scared him or something, you know.

(*Id.*)

When Reginald Sanders ran toward the house, Robert Smith ran after him. (*Id.* at 188-89.) Stephen denied that he ran toward the car at that time:

> I wasn't going towards the car. I was running towards Smith and my daddy. I was running towards them, but the gunshot went off on the porch—when they was on the porch, the gunshot went off, so I ran towards a driveway, and I

slipped and fell right there. When I turned around, Reginald [sic] was on the ground shooting trying to get up.

> Q. Okay. By the time you got over on the driveway, somebody else is—you said Reginald was on the ground.

> A. Yeah, Reginald—no, not Reginald.

> Q. I'm sorry. So you meant Mr. Smith was on the ground?

> A. Mr. Smith, yeah.

(*Id.* at 189.) Stephen testified that he was on the ground "beside the car on the driveway between the grass and the driveway. I fell right there. My legs was on the driveway, my face was on the grass." (*Id.* at 190.) He testified that "I seen the tussling until the shots went off. Then when the shots went off, I broke and tried to run in the house." (*Id.*) The first two shots went off during the tussle. (*Id.*) According to Stephen:

> He was tussling with my father, and the shots went off, pow. One shot went off; my father went back; he shot him again. You know what I'm saying, then he—I guess he fell back over. I didn't see when he fell. I don't know how he fell because when I turned around, he was already on the ground.

(*Id.*) Stephen saw Robert Smith shoot the victim twice. (*Id.*) In response to whether those bullets had hit the victim, Stephen replied:

> I don't know if the first two hit him—the very first two hit him, but it looked like—I know the first one hit him because it was right up on him, you know what I'm saying, like this (indicating), and the gun went off, pow. And I guess my father pushed him back or something, and it went off again. I don't know if it went through the window or my father, but he shot my father twice, you know.

(*Id.* at 190-91.)

Stephen testified that he heard two shots and then, after he ducked and ran, he heard additional shots. (*Id.* at 191.) He testified that "I'd say at least—I don't know—it got to be like eleven or twelve." (*Id.*) Stephen denied that he had shot anyone, stating that "I didn't have a

50

gun." (*Id.*)  Stephen testified that Robert Smith was the only person he saw with a gun and the only person who was shooting.  (*Id.* at 191-92.)  Robert Smith had one weapon.  (*Id.* at 192.)

On cross-examination by Albert Smith's lawyer, Stephen testified that he didn't hear Albert Smith say anything.  (*Id.* at 192.)  According to Stephen, "Albert Smith was like he was scared.  He was sitting there like he was shaking." (*Id.*)  Stephen did not see Albert Smith with a gun.  (*Id.* at 193.)  Stephen testified that, when Robert Smith pulled out a gun, Albert Smith ran toward his car.  (*Id.*)

Stephen admitted that Robert Smith did not fire any shots until he and the victim started tussling.  (*Id.*)  In response to whether the victim was trying to get Robert Smith's gun away from him, Stephen replied:  "I guess—just stop him, period." (*Id.* at 193-94.)

Stephen reiterated that Black had been driving his car.  (*Id.* at 194.)  In response to whether he told Black to park in front of Albert Smith's car, Stephen testified:  "You know, not really, but we kind of knew what was going on once [Dorsey, Jr.] told us, like, 'There he go—there go his daddy—there go his daddy,' so we parked right there." (*Id.*)  Stephen was asked what he thought was going on, and he responded:

> They were—my dad looked—looked like they were talking at first—looked like they was talking.  I don't know what Robert was saying, but they was talking. I'm pretty sure they were trying to, you know, settle it out.  But once I got out, it was like Robert went crazy.

(*Id.*)  Dorsey, Jr. had told Stephen that "a little boy named Travis busted his head with a pipe." (*Id.*)

After he got Reginald Sanders from the store, Stephen testified that he drove "directly back to the cove." (*Id.* at 195.)  They did not go driving around looking for Robert Smith and Travis Watt.  (*Id.*)  According to Stephen, they drove to the store to get Reginald Sanders to "see what

some more facts about it. When we got to the house, Robert and Albert were already there." (*Id.*) In response to whether he was surprised to see Robert Smith, Stephen replied: "No, not really. I was like if he—if the little boy busted his head, why did they come around my father's house, period. That's what I was like." (*Id.*) Stephen admitted that "I was angry about the situation. Yeah. I really was, but wasn't nothing to, you know, have no gun about." (*Id.* at 196.)

Stephen testified that Black did not have a gun. (*Id.*) He did not know Black's real name or where he was at the time of the trial. (*Id.*) Stephen testified that Black was "kind of a friend," but they "weren't just friends that long." (*Id.*) In response to the fact that Black was driving Stephen's car, Stephen testified that "we just hung around in the hood or something." (*Id.*) Stephen met Black in 2001 "[j]ust over there by Mississippi and Whitehaven. I just met him over there one day." (*Id.*) Black had never stayed with Stephen. (*Id.* at 197.)

Stephen had gotten up at 2:00 p.m. on October 4, 2002 and went to his father's house at about 3:00 p.m. (*Id.*) He met up with Black at Black's house in Whitehaven. (*Id.*) They had no plans for the day other than "[r]iding around." (*Id.*) Stephen wanted to go check on his family. (*Id.*) Stephen testified that Black was driving "[j]ust because I didn't feel like driving that day, I guess." (*Id.*)

Reginald Sanders testified that he lived on Brutonwood Cove with the victim, Dorsey, Jr., Antoinette Dorsey, Taneka Blair and Lacotra Blair. (*Id.* at 199.) At the time of trial, he lived on Brutonwood Cove with Taneka Blair. (*Id.*) Reginald Sanders and the victim were first cousins. (*Id.*)

Reginald Sanders testified that he was at home on October 4, 2002. (*Id.* at 199-200.) At some point between 3:00 and 3:15 p.m., Reginald Sanders walked to the store with Dorsey, Jr. and Stephen. (*Id.* at 200-01.) They did not make it to the store "[b]ecause when we was on our way, Marcus had—Marcus Stephen had—you know, was coming around the corner, and he was like, 'What's going on?' And Anthony Dorsey, Jr. was telling him so we was on our way back to the house." (*Id.* at 201.) What was going on was that "Anthony Dorsey, Jr.'s head got busted." (*Id.*) Reginald Sanders denied that they were trying to find the person who hit Dorsey, Jr. (*Id.*) He denied that Stephen had urged them to find the boy who had hit Dorsey, Jr. (*Id.*) According to Reginald Sanders, "[w]e was just going to the store and coming back because Anthony Dorsey, Sr., said he was just being to let it rest until Monday morning." (*Id.* at 202.)

Reginald Sanders got in the car with Stephen. (*Id.*) The other people in the car were Marcus Stephen, Marcus Hall and Dorsey, Jr. (*Id.*) Marcus Hall was also known as "Black." (*Id.*) Hall was not a friend of Reginald Sanders. (*Id.*) They drove to the house on Brutonwood Cove. (*Id.*) Hall was driving the car. (*Id.*) Nobody in the car was armed with a gun, a knife or a stick. (*Id.* at 202-03.)

Reginald Sanders testified that, "[w]hen we got to the house, Mr. Smith and his brother was already there." (*Id.* at 203.) Reginald Sanders did not know Robert Smith or Albert Smith. (*Id.*) Aside from the Smith brothers and the victim, Reginald Sanders testified that "Lacotra, Taneka, [Dorsey, Jr.], Christine, Jamie—basically all [the victim's] kids was there and I was there and my neighbor was outside." (*Id.*) Reginald Sanders agreed that there were a lot of people outside. (*Id.*)

Reginald Sanders testified that, "[w]hen we pulled up, me, Marcus, and Anthony Dorsey, Jr., got out of the car." (*Id.*) In response to whether they had gotten out of the car ready to fight, Reginald Sanders replied: "No. We just got out of the car. And then once we started walking towards them, Anthony Dorsey, Sr., was like, 'Everything is all right.'" (*Id.*) The victim made that statement to Stephen and Reginald Sanders. (*Id.* at 204.) According to Reginald Sanders, "[w]e didn't say anything when we got out the car. We just walked up." (*Id.*) Reginald Sanders continued:

> So when we came—when we got out the car and was walking towards him, my cousin was like, "Everything is cool." I was like, "Okay." By that time, he pulled out—he pulled his gun out.
>
> Q. Who did?
>
> A. Robert Smith.
>
> Q. Where did he pull it from?
>
> A. From his pocket.
>
> Q. What did he do with it?
>
> A. He grabbed Marcus Stephen in the collar and told him, "Dude, do you want me to blow your brains out?" And by that time, Antoinette, you know, was walking up towards him, and he turned around and he was fixin' to hit her with the gun.

(*Id.* at 204-05.)

Reginald Sanders testified that, when Robert Smith pulled out his gun, "I was headed towards the house." (*Id.* at 205.) In response to why he ran toward the house, Reginald Sanders explained:

> Because Taneka was—Taneka Blair was coming out the house. And when I'm coming up to the house, he was behind me. And so when I pushed her back in

54

> the house, he was—he was stepping in.  That's when Anthony Dorsey, Sr., grabbed him and was like, "I can't let you go in my house.  I've got kids in there."

(*Id.*)  At that time, Reginald Sanders was standing in the doorway and the victim was on the porch.  (*Id.*)  Robert Smith was behind Reginald Sanders.  (*Id.*)  Robert Smith was not saying anything.  (*Id.*)  Reginald Sanders was asked again why he ran toward the house, and he replied:

> Because my cousin just had a baby, and she was coming outside.  And that's when he had already pulled out the gun; she was coming out the door.  So I was trying to push her out the way so she couldn't get hurt.

(*Id.* at 206.)

After the victim told Robert Smith he could not let him into his house, Robert Smith shot the victim.  (*Id.*)  The bullets hit him "[i]n the stomach and in his chest."  (*Id.*)  The victim and Robert Smith were on the front porch, and Reginald Sanders was in the doorway.  (*Id.*)  The front door was halfway shut.  (*Id.*)

Reginald Sanders continued:  "Then after that, when he was stepping off the porch, he slipped, and he kept on shooting.  Then they got in the car and sped off."  (*Id.* at 207.)  Reginald Sanders was asked who was driving the car, and he replied:  "I couldn't really tell you that because I was on the inside of the house."  (*Id.*)  In response to how many gunshots he heard, Reginald Sanders testified:  "It was a lot.  I couldn't just tell you right off number.  I know it was a lot of shots."  (*Id.*)  Reginald Sanders denied that he shot at the car, and he testified that neither Black nor Stephen did either.  (*Id.*)  According to Reginald Sanders, "Didn't nobody have a gun that day."  (*Id.*)  The victim did not keep a gun.  (*Id.*)

After that, they called an ambulance for the victim.  (*Id.*)  Reginald Sanders recalled that "we was just hysterical at that time.  We didn't know what to do."  (*Id.* at 207-08.)  Reginald Sanders went to the hospital, and he went to the police station after the victim had been

pronounced dead. (*Id.* at 208.) Reginald Sanders was placed under arrest and charged with shooting at Travis Watt. (*Id.*) He denied that he had shot at Travis Watt. (*Id.*) Reginald Sanders recalled that Travis Watt had been on the scene that day. (*Id.* at 209.) According to Reginald Sanders, "[h]e was standing next to his Uncle Albert Smith." (*Id.*) Watt was just standing there and did not say anything. (*Id.*) Albert Smith also did not say a word. (*Id.*) Reginald Sanders was released after he gave a statement. (*Id.*) He affirmed that his statement to police was the truth. (*Id.*)

On cross-examination by Robert Smith's attorney, Reginald Sanders reiterated that he walked to the store with Dorsey, Jr. (*Id.* at 210.) Marcus Stephen picked them up and drove back toward Brutonwood Cove. (*Id.* at 210-11.) Reginald Sanders believed that Stephen "wanted to know what was going on. He wanted to talk to his dad about what happened." (*Id.* at 211.) As far as Reginald Sanders knew, Stephen had not been to the house. (*Id.*)

Reginald Sanders reiterated that, after Robert Smith pulled out his gun and grabbed Stephen, he ran toward the house to protect Taneka Blair. (*Id.* at 211-12.) According to Reginald Sanders, "[s]he was coming out the door. I pushed her back inside." (*Id.* at 212.) Reginald Sanders denied that he laid down on top of her. (*Id.*) Instead, he "just held her down" with one hand. (*Id.* at 212-13.) He agreed that he was leaning over Taneka Blair. (*Id.* at 213.) While Reginald Sanders was holding Taneka Blair down, Robert Smith was in the doorway. (*Id.*) Reginald Sanders recalled that the victim grabbed Robert Smith and there was a tussle. (*Id.*) In response to whether the gun went off during the tussle, Reginald Sanders testified that "[t]he gun went off when he snatched it away from him. He snatched away from him, and that's when he shot." (*Id.*) According to Reginald Sanders, both shots that hit the victim were frontal shots.

(*Id.* at 214.)   In response to whether the front door was halfway open the whole time, Reginald Sanders replied, "By that time, after the shooting was over with, I was coming out the door.   He was still shooting.   He was already in the car.   They was down the street."   (*Id.*)

Reginald Sanders reiterated that he did not know Robert Smith before that day.   (*Id.*)   He testified that he did not know where Robert Smith lived.   (*Id.* at 214-15.)   Reginald Sanders believed that Robert Smith's weapon was a nine millimeter pistol.   (*Id.* at 215.)   He could tell the type of weapon it was by its model and shape.   (*Id.*)   He also testified that the investigators had told them that they found nine millimeter shells.   (*Id.*)

Reginald Sanders was asked whether Robert Smith had said anything when they pulled up, and he replied:

> He said—all he was saying to my cousin was, "What you want to do?"   My cousin was like, "What you mean what I want to do?   Man, we out here talking about two eleven-year olds getting into a fight."   And he kept talking about, "I done been to the penitentiary once; I'll go back for my boy."
>
> My cousin was like, "What's all that for?   We out here talking about two eleven-year olds."
>
> And he's steady talking about, "What you want to do?"

(*Id.* at 215-16.)   When he was shooting, Robert Smith held his gun in his right hand.   (*Id.* at 216.)

Reginald Sanders recalled making a statement to the police.   (*Id.* at 216-17.)   He remembered telling the police that, by the time he was interviewed, he had learned where Robert Smith lived.   (*Id.* at 216-17.)   Reginald Sanders told the police that "I didn't know where he lived at first, but there were some people that told us that he stayed on the next street over from us."   (*Id.* at 216.)   Reginald Sanders reiterated that Robert Smith had said to the victim, "I'll go back to prison for my son.   My son ain't no punk."   (*Id.* at 219-20.)   In his statement to the police,

Reginald Sanders said that Robert Smith had waved the gun around and said "Nobody is going to do anything to my son." (*Id.* at 220.)

Reginald Sanders testified that he did not pick up a weapon inside the house and fire back at Robert Smith. (*Id.* at 221.) He did not fire at Robert Smith's car. (*Id.*) He did not injure Travis Watt. (*Id.*)

On cross-examination by Albert Smith's attorney, Reginald Sanders was asked how many shots he heard, and he responded, "I couldn't tell you the number right offhand. It was a lot, though." (*Id.* at 222.) In response to whether he had heard ten or more shots, Reginald Sanders testified, "I can't say no more. It was quite a few. It was like, I'd say around eight or nine." (*Id.*) Reginald Sanders admitted that he had told the police that he heard five or six shots. (*Id.*) He explained that "[t]hat was my statement to the police, but I also told them that it was a lot. And then they told me to just give them a number." (*Id.*) Reginald Sanders agreed that he gave a statement while the events were fresh in his mind. (*Id.*)

Reginald Sanders admitted that he did not tell the police that Robert Smith had talked about how he had been to the penitentiary and how he did not want to go back. (*Id.* at 223.)

Reginald Sanders was aware that Travis Watt had been shot while riding in the gold car and that the car had bullet holes in it. (*Id.*) The police had told Reginald Sanders that two types of bullet casings were found on the scene, nine millimeter and thirty-two caliber. (*Id.* at 223-24.) Reginald Sanders had no explanation for how the other bullet casings got there. (*Id.* at 224.)

Reginald Sanders testified that the victim was trying to get the gun away from Robert Smith and that Robert Smith pulled away and fired. (*Id.*)

Reginald Sanders did not see Albert Smith with a gun. (*Id.*) Albert Smith did not appear to be surprised or scared. (*Id.*) According to Reginald Sanders, "he was just standing there." (*Id.*) Reginald Sanders did not notice what Albert Smith did after Robert Smith pulled out his gun because he was running toward the house. (*Id.* at 224-25.) Reginald Sanders admitted that he disregarded Robert Smith's instruction to everyone to stay where they were. (*Id.* at 225.) In response to why he did not holler at Taneka Blair and tell her to get inside, Reginald Sanders replied, "But that time, I wasn't even thinking about hollering. All I was thinking about was, you know, getting covered, you know what I'm saying. He probably could have thought she had something coming out the door. He could have shot her." (*Id.*)

Christine Sanders testified that she lived on Brutonwood Cove in the other half of the duplex in which the victim and his family lived. (*Id.* at 227-28.) Christine Sanders was home on the day on which the victim was killed, which she believed was October 2, 2002. (*Id.* at 228.) She testified that she "was standing on Anthony's porch . . . [t]alking to him. And he went back in the house to finish fixing on his cabinet, and I was still sitting on the porch, and Robert Smith pulled up in front of the house." (*Id.* at 228-29.) Christine Sanders testified that she did not know Robert Smith and had not seen him before. (*Id.* at 229.) Robert Smith was with "his brother Albert and his son." (*Id.*) They were in a four-door car. (*Id.*) Albert Smith was driving and, when they arrived, "Robert was the first one to get out." (*Id.* at 230.) Christine Sanders was still on the victim's porch, and the victim was coming out the door. (*Id.*) According to Christine Sanders, Robert Smith "got out of the car with his hand in his pocket, and a phone—he had an earpiece on his ear talking . . . on the phone—just talking real radical like, you know, harming people the way he was talking." (*Id.* at 230-31.) Christine Sanders testified that Robert

Smith "was talking like he was just angry about something."  (*Id.* at 231.)  Robert Smith was "[r]eal upset."  (*Id.*)

After the car pulled up, the victim's children "told their daddy that Robert Smith is out there—the guy that had something to do with D.J. got beat up."  (*Id.* at 231-32.)  "And Anthony came outside with his towel across his shoulder because he was fixing his sink."  (*Id.* at 232.) The victim did not come running out, and he did not have a gun, a knife or a stick.  (*Id.*) Christine Sanders testified that, as the victim came out, Robert Smith had already gotten out of his car, and Robert Smith's son was still sitting in the front seat.  (*Id.*)  Travis Watt "acted like he didn't want to get out" of the car (*id.*), but "Robert made him get out the car and told him, 'You ain't—you don't be scared of nobody because you're not a punk—I didn't raise a punk.'"  (*Id.* at 232-33.)  Christine Sanders believed that Watt did not want to get out of the car "[b]ecause he was hesitating to get out—he was hesitating because his daddy asked him twice to get out the car." (*Id.* at 233.)  Robert Smith did not ask his son to get out of the car nicely.  (*Id.*)  He said, "Get out of the car.  You ain't need to be scared of nobody.  Get out of this car."  (*Id.*)  Travis Watt got out of the car.  (*Id.*)  Christine Sanders testified that the victim was asking Robert Smith why he had taken a pipe and hit his son on the head, and "Robert was requesting [sic], 'I'm not a punk.  I just got out the penitentiary for killing me a nigger.  I don't mind going back for my boy.'  That's the exact words he said."  (*Id.* at 233-34.)  Christine Sanders continued:

> So Anthony Dorsey replied back to him and told him, "Well, it's not about?—we ain't with no fighting.  I wanted to know why did you take it upon yourself to let your son do what he did to my son."
>
> Q.     Had Robert Smith calmed down at this point?
>
> A.     No, no, no, no, no, no, no, no.   Robert was on the phone talking as he was talking to Anthony.

Q.      Okay.   Was his voice elevated?—was he talking loudly?

A.      Yes, ma'am.

Q.      Okay.   Was Anthony Dorsey yelling?

A.      No.   Anthony was asking him—"We can settle this like men."

Q.      Okay.

A.      We can talk about this or—you know, just talk about it and see why it go this far.   But Robert Smith didn't want to talk about it.

Q.      Why?—what gave you that impression?

A.      Because the impression he gave me when he came—got out of the car, it looked like he had a handgun in his pocket.   The whole time he was standing there, he had his hand in his pocket the whole time.   And I was like, "Anthony, it looks like this man got something in his pocket."   So—

Q.      Did you tell Anthony—

A.      Yeah.   I'm standing there right beside him telling him this. Anthony didn't raise his voice.   He was just calm about everything.   I had never seen him that calm.   He was so calm that day.

Q.      Okay.

A.      And he told Robert Smith, "I didn't ask you all that.   I wanted to know what happened between my son and your son."

He was like, "Well, my son ain't no punk, and he took care of his business like he's supposed to."   And that's how it was.

(*Id.* at 234-35.)

As Robert Smith was standing there, the victim's stepson, Marcus Stephen, pulled up in front of Smith's car and got out of the car.   (*Id.* at 235.)   Christine Sanders testified that three people got out of the car and walked up, but she was paying attention to Robert Smith.   (*Id.* at

235-36.)  According to Christine Sanders, "[t]hat's when Robert pulled his pistol out."  (*Id.* at

236.)  Christine Sanders continued:

> And as Marcus was telling him, "Why did you all jump on my brother like that, walking up on him"; and Robert grabbed him as he got close, and Anthony put his arm out and said, "I can—we going to handle this like men.  We're going to talk about this."
>
> Q.  Who did Robert grab?
>
> A.  Robert grabbed Marcus in the collar and put the gun to his head.
>
> Q.  Okay.
>
> A.  And told him he'll blow his ass off—I mean, A off.

(*Id.*)

Christine Sanders testified that Marcus Stephen, Reginald Sanders and Dorsey, Jr. did not

charge toward Robert Smith.  (*Id.* at 236-37.)  None of them approached Travis Watt or put their

hands on him.  (*Id.* at 237.)  In response to whether anybody said they were going to put their

hands on Watt, Christine Sanders replied:

> No, ma'am; no, ma'am; no, ma'am.  No, ma'am.  Didn't nobody say anything about their child.  Anthony was so concerned about why did this grown man—because kids are going to play all day and every day.  That's not for no grown people to get into it—you know, get involved with children's fights, you know, because they're gonna play again tomorrow and the next day and the next day.

(*Id.*)

Christine Sanders testified that, as Stephen and the others were walking up, Robert Smith

pulled the gun out and grabbed Stephen by the collar.  (*Id.*)  Christine Sanders continued:

> He pulled it up.  He grabbed—he got—Marcus got a little closer, and he reached out and grabbed Marcus and pulled Marcus to him and put the gun to his head and told him he'll blow his A/F head off.

And about that time, Anthony's daughter, Antoinette, she was walking like, "Don't shoot my brother," and I break my hand between her to push her back. At that time, Anthony was shocked—didn't know what to do—because this man got a gun, and we was supposed to be talking about this, and he came over my house with a gun?—and he was just shocked about it because he couldn't believe it.

> Q. What did he do?

> A. He was standing there while just in shock. I was in shock. He had everybody—told everybody, "Don't move"—Robert did—Robert said, "Don't nobody—don't narry MF move—don't nobody move." Didn't nobody move—couldn't nobody move. He's the only one that had a gun. Didn't nobody do no moving. Everybody was too scared to move.

(*Id.* at 238.)

After Reginald Sanders got out of the car, he ran toward the house. (*Id.* at 238-39.)

According to Christine Sanders, Reginald Sanders was not going into the house to get a gun. (*Id.* at 239.) She testified that "Anthony don't even own a gun" and neither did Reginald Sanders. (*Id.*) Christine Sanders testified that Reginald Sanders

> [r]an toward the—Scooter ran in the house. After Scooter ran in the house, that's when Robert—I saw him running—ran toward him. Anthony—me and Anthony are still standing there in shock. He ran up towards the door after Reginald. After Reginald got him in the house and closed—tried to close the door—

> Q. Um-hum.

> A. —Robert Smith grabbed for the door.

(*Id.* at 239-40.) Robert Smith made it to the porch before the victim did and "tried to get behind Reginald Sanders." (*Id.* at 240.) Christine Sanders continued:

> So Anthony paused. He was like, "I don't believe"—he was like in a state of shock. So when he did turn around to go up on the porch where Robert Smith was, he said, "I can't let this man disrespect my home like this right here." He never did get a chance to go in the house. Anthony never did get a chance to go in the house. Anthony ran up on his porch and grabbed Robert from behind.

> Q. Okay.

> A. About that time—by us knowing that this gun—that this man got a gun—
>
> Q. Where were you?—were you still in the yard?
>
> A. Yeah, I'm still in the yard getting the children—getting the kids out of the way.

(*Id.* at 240-41.) Christine Sanders had three children who were out in the yard that day. (*Id.* at 241.) In response to what she saw on the porch at that point, Christine Sanders testified that the men were "tussling" and that "Anthony trying to get him from coming up out of—going in his house—tussling." (*Id.*) Robert Smith still had the gun in his hand. (*Id.* at 241-42.) Christine Sanders testified that, as she was moving children out of the way, "I hear gunshots. Gunshots—just shots." (*Id.* at 242.) In response to how many shots she heard, Christine Sanders replied: "It was just a lot of shots. I really couldn't just tell you, but it was a lot of shots fired." (*Id.*) Christine Sanders ran into her house to see whether anybody inside had been hit. (*Id.*) Prior to that, Christine Sanders had been "right there on the porch on [her] knees grabbing children—grabbing them out the way because it was just gunshots going everywhere." (*Id.* at 243.) When she came back outside to get the rest of the children, Christine Sanders observed that

> people was running anywhere. I saw Robert Smith backing down off—backing up on the porch. I saw him when he fell. When he fell, he was trying to get up—waiving the gun trying to, you know, shoot. He's waiving—
>
> Q. You're moving your arm all around. Is that—
>
> A. Yeah. That's what he was doing. He was trying to get up—trying to get up. And when he did get up, I ran on in the house because he was still a shooting.
>
> Q. Okay.
>
> A. And he got on in his car and they drove off.

> Q.     Did you see him get in his car?
>
> A.     Yeah.  Yeah.  I did see him because he backed—when he was backing up, he was steady shooting, and he couldn't hardly get up in there—like backwards.   He was trying to get in the car backwards—getting in the backseat of the car backwards.
>
> Q.     Okay.
>
> A.     And he kind of stumbled like—about that time, I'm still—I done got my head down then.
>
> Q.     Is he still shooting while he's getting I [sic] the car?
>
> A.     Yes, ma'am, he was.

(*Id.* at 243-44.)   Travis Watt had gotten into the car on his own "when he saw his daddy scuffling."  (*Id.* at 244.)   Christine Sanders was not paying any attention to Albert Smith.  (*Id.*)  The car "took off fast—real fast like burning rubber—getting off the street."  (*Id.* at 245.)

Christine Sanders testified that she did not see anybody shooting at Albert Smith's car.  (*Id.* at 244.)   In response to the number of people who had a gun out there that day, Christine Sanders responded:   "Only one person I saw with a gun was Robert Smith."  (*Id.* at 245.)

 After she heard the gunshots, Christine Sanders walked over to the victim.  (*Id.*)   She testified:

> I saw him lying there bleeding from his wounds—from his gunshot wounds.   And he was asking me, "How bad is it?"   I said, "Anthony, it's not that bad.   It's not that bad, Anthony.   You're going to be all right.   It's not that bad."
>
> And he was like, "Make sure—you make sure that my family be all right."   And he said the only thing he was trying to do was protect his family, and he did not want that to happen—that he was really trying to find out what was the problem of him—of this man jumping in this fight with his son.   That's was the only problem.   Anthony was not a bad person.

(*Id.*)

On cross-examination by Robert Smith's lawyer, Christine Sanders testified that she was not at the victim's house when Dorsey, Jr. came home with a head injury. (*Id.* at 246.) When Dorsey, Jr. came home, Christine Sanders was called and came to the house. (*Id.*) According to Christine Sanders, the victim and Dorsey, Jr. drove to the place where the fight occurred and then came back home. (*Id.* at 246-47.) Christine Sanders testified that, when Robert Smith pulled up, she walked down the stairs with the victim and approached Smith. (*Id.* at 248.) Robert Smith made his son get out of the car. (*Id.* at 249.)

Christine Sanders did not know how long it was before Stephen's car pulled up. (*Id.*) Antoinette Dorsey was standing outside, and she was the person who recognized Robert Smith. (*Id.* at 249-50.) Christine Sanders testified that, after Robert Smith had grabbed Stephen, "Antoinette said, 'Don't—don't put that gun in my brother's face—don't shoot my brother.' And I grabbed my hand, and moved her back." (*Id.* at 250.) By that time, "Reginald had already ran towards—mostly—he was easing toward the yard. When Robert Smith was talking to Antoinette, that's when Anthony—or Reginald ran into the house." (*Id.*) Robert Smith "noticed Reginald running into the house. That' when he threw—let Marcus go and threw his gun on everybody and ran up on the porch after Reginald Smith." (*Id.* at 250-51.) Christine Sanders testified that,

> [a]fter Robert Smith got on that porch, Anthony paused for about a second because he was in a daze. He walked up on—got up—ran up—walked up on the porch. It's not too far from the street. He walked up on the porch and grabbed him. Anthony—
>
> Q.     —grabbed Robert Smith at the doorway, right?
>
> A.     Yeah, because Robert Smith was making his way into Anthony's house—

Q.     Yes, ma'am.

A.     —where the rest of his kids and his grand baby was.

(*Id.* at 251.)   According to Christine Sanders, "Anthony Dorsey grabbed Robert Smith to keep him from going into his house."   (*Id.* at 252.)   While the victim and Robert Smith were tussling on the porch, "[t]hat's when the gunshots go off.   Robert was shooting Anthony—he had the ups on Anthony with a gun."   (*Id.*)   In response to whether the gun went off during the tussle, Christine Sanders responded:   "No.   They had got through tussling.   He snatched aloose from Anthony."   (*Id.*)   Christine Sanders clarified that the victim never had the gun.   (*Id.*)   Instead, "Anthony ran and grabbed him from behind.   He snatched aloose from Anthony."   (*Id.*)   At that point, Robert Smith shot the victim.   (*Id.* at 253.)

On cross-examination by Albert Smith's lawyer, Christine Sanders testified that, when Marcus Stephen was walking toward the group of people, "[h]e was asking Robert Smith why did he—why would he hit his son—hit his brother with a pipe.   Why would he get his son to hit his brother with a pipe?"   (*Id.* at 255.)   Christine Sanders did not know whether a story was circulating that Robert Smith had anything to do with the fight between the two boys.   (*Id.* at 256.)

After the shooting, Christine Sanders called 911 but could not get through because the line was busy.   (*Id.*)   Other people also called the police.   (*Id.*)   In response to whether she had named Reginald Sanders as one of the shooters, Christine Sanders testified:   "No, I did not. Reginald Sanders didn't even have a gun.   He didn't come back out the door.   He was still in the house."   (*Id.* at 256-57.)   Christine Sanders reiterated that she heard shots as the car sped off. (*Id.* at 257.)   She did not know who was shooting from the car because she was busy grabbing children.   (*Id.*)

Christine Sanders did not know Marcus Hall or "Black." (*Id.*) She did not know who was driving Stephen's car when he arrived. (*Id.*) She explained: "I didn't pay attention. Really, I was—really, my focus was on Robert because he was really aggressive, and had a—it looked like a weapon in his pocket. When he did pull it up, it was a weapon in his pocket." (*Id.* at 257-58.)

Christine Sanders testified that she never saw Albert Smith with a gun. (*Id.* at 258.) She testified that "Albert Smith stayed on the back side of the car. I wasn't focusing on Albert. My main interest was Robert." (*Id.*) Christine Sanders testified that Albert Smith "brought them there to the scene." (*Id.*) She did not know whether Albert Smith said anything or not. (*Id.* at 258-59.)

Christine Sanders reiterated that she did not see anybody shooting at Albert Smith's car. (*Id.* at 259.) She did not know who shot Travis Watt. (*Id.* at 259-60.)[12]

In short, four witnesses—Dorsey, Jr., Lacotra Blair, Taneka Blair and Christine Sanders—testified that Robert Smith had stated that he would kill on behalf of his son. The witnesses testified that the victim was calm. When Marcus Stephen and Reginald Sanders arrived, the victim made clear that he intended to handle the situation and that they were not to intervene. The victim was not armed. Robert Smith pulled out a gun, grabbed Stephen and threatened to shoot him. Robert Smith also followed Reginald Sanders onto the victim's porch and attempted to force his way into his house. After a struggle with the victim near the doorway, Robert Smith stepped back and shot the victim in the chest from a distance of two feet or less.

---

[12] Robert Smith rested before Albert Smith and Travis Watt testified. (*See* Trial Tr. 392, *State v. Smith,* No. 02-09026 (Shelby Cnty. Crim. Ct.), ECF No. 14-6.)

The TCCA noted that "[t]here was evidence which strongly indicated that shots were fired at the defendant's vehicle and its occupants. However, no witness stated that these shots were fired until after the victim was fatally wounded and the defendant's group was escaping the scene." *State v. Smith,* 2006 WL 3147056, at *3. A police officer witness testified that there were both nine millimeter and .32 caliber casings and bullet fragments on the scene. There was damage to the vehicle that Albert Smith had driven to the scene that appeared to be caused by gunshots, and Travis Watt was shot in the arm. The evidence suggests that someone was shooting toward the vehicle as Robert Smith and Albert Smith fled the scene, after the victim had been shot.

The TCCA's conclusion that the evidence presented at trial was sufficient to sustain Robert Smith's conviction for second degree murder was not an unreasonable application of *Strickland v. Washington* and was not based on an objectively unreasonable factual determination. Claim 1 is without merit and is DISMISSED.

## B.    The Allegedly Unlawful Sentence (Claim 2)

In Claim 2, Smith argues that he is actually innocent of the sentence as a persistent and repeat violent offender. (Am. § 2254 Pet. at PageID 56-59, *Smith v. Parris,* No. 2:12-cv-02436-STA-dkv (W.D. Tenn.), ECF No. 7.) He also claims that "he is being deprived of his Fifth and Fourteenth Amendment rights that he not be restrained of his liberty without Due Process." (*Id.* at PageID 56-57.) According to Smith, he did not have the requisite prior convictions to be sentenced as a Range III career offender. (*Id.* at PageID 58.)

In his Answer, Respondent first argues that Claim 2 is not cognizable in a federal habeas petition insofar as it argues that Smith's sentence was imposed in violation of Tennessee law. (Answer at 13-14, *Smith v. Parris,* No. 2:12-cv-02436-STA-dkv (W.D. Tenn.), ECF No. 7.) A

federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Error in the application of state law is not cognizable in a federal habeas proceeding. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); *Pulley v. Harris*, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law."). Therefore, Claim 2 is not cognizable in a § 2254 proceeding insofar as it seeks relief for an alleged violation of Tennessee law.

Smith's reliance on the Supreme Court's decision in *Dretke v. Haley,* 541 U.S. 386 (2004), is misplaced. (*See* Am. § 2254 Pet. at PageID 58, *Smith v. Parris,* No. 2:12-cv-02436-STA-dkv (W.D. Tenn.), ECF No. 7; Reply at 7, *id.*, ECF No. 35.) In *Dretke,* 541 U.S. at 388-89, 393-94, the Supreme Court declined to decide whether state prisoners can overcome procedural defaults by demonstrating their "actual innocence" of a non-capital sentence. *Dretke* did not recognize actual innocence of a non-capital sentence as a substantive claim for relief. Therefore, Smith has no constitutional claim based on the invalidity of his sentence under Tennessee law.

Respondent also argues that Claim 2 is barred by procedural default because Smith failed properly to present it to the Tennessee courts. (Answer at 14-15, *Smith v. Parris,* No. 2:12-cv-02436-STA-dkv (W.D. Tenn.), ECF No. 7.) Smith failed to raise Claim 2 on direct appeal. (*See* Br. of the Appellant, Robert Smith, at 2, *State v. Smith,* No. W2005-00015-CCA-R3-CD (Tenn. Crim. App.), ECF No. 14-8 at PageID 844.) He also failed to raise Claim 2 as a standalone claim in the post-conviction appeal. (*See* Br. of the Appellant at 6, *Smith v. State,* No. W2010-00305-CCA-R3-CD (Tenn. Crim. App.), ECF No. 14-16 at PageID

1159.)  Therefore, Smith has failed to exhaust Claim 2 in state court and, because no further avenue exists to do so, it is barred by procedural default.

In his Reply, Smith argues that his procedural default was due to the ineffective assistance of post-conviction counsel and can be excused by the Supreme Court's decisions in *Martinez v. Ryan*, 132 S. Ct. at 1315, and *Trevino v. Thaler,* 133 S. Ct. at 1921, which provided a limited avenue for prisoners to overcome the procedural default of claims of ineffective assistance by trial counsel.  (Reply at 7, 8, *Smith v. Parris,* No. 2:12-cv-02436-STA-dkv (W.D. Tenn.), ECF No. 35.)  *Martinez* and its progeny cannot excuse Smith's default of Claim 2 because it is not an ineffective-assistance claim.  *See supra* p. 10.

Claim 2 is without merit and is DISMISSED.

### C.    Ineffective Assistance of Counsel (Claim 3)

In Claim 3, Smith argues that his attorney rendered ineffective assistance, in violation of the Sixth Amendment.  (Am. § 2254 Pet. at PageID 60-72, *Smith v. Parris,* No. 2:12-cv-02436-STA-dkv (W.D. Tenn.), ECF No. 7.)  Specifically, Smith complains that his attorney (i) failed to obtain funds for a ballistics expert to conduct an independent examination of the bullets recovered from the scene and from Travis Watt's arm; (ii) failed to thoroughly cross examine the witnesses to the crime; (iii) failed to challenge the indictment because no affidavit of complaint was issued and there was a lack of probable cause; and (iv) failed to investigate and review his prior criminal history, his arrest record and the presentence report.  (*Id.* at PageID 61.)

Smith raised portions of Claim 3 in the post-conviction proceeding.  The following evidence was presented at the post-conviction hearing:

> Trial counsel testified that he had multiple theories of the petitioner's case.  Trial counsel believed he could argue (1) that someone other than the petitioner shot the

victim, (2) that the petitioner shot the victim in self-defense, or (3) that the petitioner shot the victim in the heat of passion and committed only the lesser included offense of voluntary manslaughter. Trial counsel recalled that Travis Watt,[13] the petitioner's son, had been shot in the arm after the fatal shooting on the porch, while fleeing the crime scene in a car. Trial counsel did not request any testing on the bullet from Watt's arm "[b]ecause [he] didn't think it was relevant to whether or not Mr. Smith had shot the victim on the porch," and "[b]ecause Travis was shot in the car as they were pulling off after the shooting on the porch." When pressed further regarding the ballistics evidence, trial counsel stated that "the .32 shell casings in the yard ... [supported the theory] that there was another gunman present, not necessarily the ballistics of the bullet from the boy's arm."

Trial counsel did not consider Travis Watt's testimony relevant because the issue at trial "was whether or not the gun went off during the middle of the tussle or whether or not there was a second gunman on the porch." Trial counsel emphasized that Watt's testimony would not bolster his theory of self-defense because Watt was shot after the fatal shooting. Trial counsel was also concerned that Watt would damage the petitioner's case because Watt had previously given a statement to the police claiming that his father shot the victim first.

Trial counsel recalled that Reginald Sanders was initially interviewed as a possible gunman responsible for the victim's death. Trial counsel was then questioned regarding a police report, admitted as exhibits D and E, at the post-conviction hearing.[14] Exhibit E provided, in pertinent part, as follows:

> 2335 HRS. SGT. MULLINS AND DET. GREER STARTED INTERVIEW WITH WITNESS REGINALD SANDERS AND HE WAS ADVISED OF HIS RIGHTS AND WAIVED HIS RIGHTS AND GAVE A TYPED STATEMENT OF ADMISSION. THIS WITNESS WAS NOT CHARGED WITH ANY CRIME AT THIS TIME.

Trial counsel could not recall whether he questioned Reginald Sanders regarding the "admission" in exhibit E or whether he questioned Sergeant Mullins or Detective Greer regarding the "admission" in exhibit E. Trial counsel stated he was not concerned with the "admission" because Watt told the police that his father, the petitioner, shot the victim first in an earlier paragraph within the same police report. The earlier paragraph, admitted as exhibit D provided, in pertinent part, the following:

---

[13] This witness's last name is spelled as "Watts" throughout the parties' briefs. However, we will spell his name as "Watt," consistently with our opinion on direct appeal.

[14] The record does not explain why this report was admitted into evidence as two separate exhibits.

2100 HRS. WRITER AND SGT. MULLINS TOOK A WRITTEN STATEMENT FROM VICTIM TRAVIS WATT WITH HIS MOTHER THERE AS AN OBSERVER. TRAVIS WATT STATED THAT HE AND HIS DADDY, ROBERT SMITH AND DEXTER WENT OVER ON BRUTONWOOD CV. TO TALK WITH THE OTHER BOY'S DAD ABOUT A FIGHT. TRAVIS WATT STATED THAT THESE OTHER M/B'S CAME UP BEHIND HIM AND WERE SAYING "WE GONNA GET YOU". THAT IS WHEN MY DADDY PULLED OUT HIS GUN AND TOLD EVERYONE TO GET BACK. TRAVIS WATT STATED THAT THE OTHER BOYS [sic] DADDY GRABBED HIS DADDY AND THEY GOT TO PUSHING AND THEY ENDED UP ON THE FRONT PORCH, **THAT WHEN MY DADDY, ROBERT SMITH, STARTED SHOOTING, THEN THIS OTHER M/B CAME OUT OF THE HOUSE AND STARTED SHOOTING AT THEM.** TRAVIS WATT STATED THAT THEY GOT BACK INTO THE CAR HE WAS IN THE FRONT PASSENGER SEAT WHEN A BULLET CAME THROUGH THE DOOR AND WINDOW AND HIT HIM IN THE RIGHT ARM. NOTE: TRAVIS WATT DESCRIBED THE SHOOTER AS WITNESS REGINALD SANDERS. (Emphasis added).

To the extent that trial counsel was questioned regarding his failure to cross-examine Albert Smith, the petitioner's brother and co-defendant, trial counsel stated, "The only testimony I felt like needed to be rehabilitated was the fact that he told the jury that his own brother had just gotten out of prison." Trial counsel acknowledged that he did not remember using the words "beyond reasonable doubt" during his closing argument; however, trial counsel stated, "[I] argued the facts of the case. [I] thought that created the reasonable doubt."

Regarding the use of the petitioner's convictions during trial and sentencing, trial counsel was aware that the petitioner had a prior record of felony convictions. He could not, however, recall making any motions to exclude the use of the petitioner's convictions. It was also trial counsel's standard practice to file motions challenging the use of prior convictions when the defendant had a prior record.

Lieutenant J.T. Hester of the Memphis Police Department wrote the report, previously admitted as exhibits D and E, that detailed the chronology of the police investigation in the hours following the shooting. Lieutenant Hester explained his use of the word "admission" in exhibit E as follows:

[I]t could of [sic] been an admission of being on the scene. He wasn't charged with any crime, so I'm sure it wasn't an admission of a crime. I don't know why I particularly typed that.

Lieutenant Hester further testified that he was not present when Reginald Sanders gave a statement to Sergeant Mullins and Detective Greer, nor did he read Reginald Sanders' statement. Lieutenant Hester confirmed that he was not subpoenaed for the petitioner's trial.

Sergeant Anthony Mullins of the Memphis Police Department testified and recalled taking a statement from Reginald Sanders. He confirmed that Sanders was investigated as a possible suspect. Sergeant Mullins described the statement as follows:

> My memory is that it's a witness/possible suspect statement. Again, that is the practice I commonly use for people that may have been implicated initially or be a person of interest initially but maybe our investigation reveals that they may not be a true suspect. However, to cover our basis [sic] we advise them of his [sic] Miranda Rights which is the common practice if it's a witness/possible suspect. The statement—the content of the statement is generally going to be the same. What did you see? What did you hear? What did you do? But there may be more accusatory questions in the statement and that was the nature of this statement. There were accusatory questions.

Despite considerable discussion of Reginald Sanders' statement during the post-conviction hearing and in petitioner's brief, the statement itself was never admitted at the hearing or otherwise included in the record on appeal.

Appellate counsel testified that he reviewed the petitioner's prior record and determined that sentencing as a career offender was appropriate. He did not remember whether the petitioner was on bond when the petitioner committed his prior crimes. Appellate counsel confirmed that the only issue raised in the petitioner's direct appeal was whether the evidence, primarily the petitioner's mental state, supported the petitioner's conviction for second degree murder.

In large part, the petitioner's testimony at the post-conviction hearing consisted of the petitioner repeating his claims as stated in his petition. The petitioner testified that he believed trial counsel was ineffective because:

> [Trial counsel] argued the case as (indiscernible) Anderson shot the victim instead of me. Okay. From the argument and the way that the State witnesses said everybody positioned, it was a legitimate argument. Okay. It was facts right there. But all the State witness said that I was the only person that had a gun. And, therefore, he should of [sic] had these bullets shell casings tested

....

The petitioner stated this evidence would have bolstered his claim of self-defense by refuting the State's witnesses who testified that petitioner was the only person with a gun. The petitioner was also concerned that trial counsel cross-examined Officer Davis, Officer Harper, and Sergeant Mullins regarding ballistics testing on the bullet recovered from Watt, but the testing was not performed.

The petitioner stated that trial counsel failed to acquire and present to the jury a recording of a 911 telephone call. The petitioner testified that the 911 call would have shown that Christine Sanders called 911 and reported that her brother, Reginald Sanders, was shooting. However, the petitioner acknowledged on cross-examination that he had never heard the 911 call. The petitioner further conceded that Christine Sanders testified at trial and said that she did not call 911.

At the close of the petitioner's testimony, post-conviction counsel requested permission from the court to admit "the convictions for which [the petitioner] was on bond at the time he was rearrested and ... the proof that [the petitioner] was on bond" at a later date. Without objection from the State, on August, 15, 2008, exhibits F through J were admitted into evidence as part of the post-conviction hearing. Exhibit F, a six page document, consists of the following: (1) two true and attested copies of surety bonds numbered 820638 and 820639 in the petitioner's name for the offenses of robbery and felony drug possession from M & M Bond Company; (2) a "Written Undertaking" signed by the petitioner on September 14, 1994, agreeing to appear in court for the same offenses or pay $10,000 for non-appearance which was insured by M & M Bail Co.; (3) a "Written Undertaking" for an unnamed individual[15] to appear in court for a felony drug offense or pay $3,500 for non-appearance insured by M & M Bail Co.; (4) a purported copy of the outside of the petitioner's court jacket in case number 95–01737; (5) a purported copy of the outside of an unnamed individual's court jacket.[16]

Exhibit G is a certified copy of the petitioner's judgment in case number 9501737. The judgment reflects that, on February 27, 1996, the petitioner pled guilty to unlawful possession of less than .5 grams of cocaine with intent to sell or deliver in violation of Tennessee Code Annotated section 39–17–417. He

---

[15] It is unclear for whom this document purports to insure an appearance in court because the name and signature are blacked-out.

[16] Apparently, when this page of exhibit F was copied, the top portion which denotes the case number and the name of the defendant was omitted. There are voluminous writings on this page of the exhibit which we decline to attempt to interpret.

received a six-year sentence to be served concurrently with case numbers 9501738, 9507179, 9410927, 9410928, 9410929, 9505329, 9505330, 9505331, 9505596, 9505597, and 9505598. Exhibit H is a certified copy of the petitioner's judgment in case number 9501738. The judgment reflects that the petitioner pled guilty on February 27, 1996, to robbery in violation of Tennessee Code Annotated section 39–13–401. He received a three-year sentence to be served concurrently with case number 9501737 and all of the case numbers denoted in the same.

Exhibit I is a certified copy of Rodney Wickfall's judgment in case number 9505598.[17] The judgment reflects that Wickfall pled guilty on February 16, 1996, to aggravated robbery in violation of Tennessee Code Annotated section 39–13–402. He received a nine-year sentence to be served concurrently with case numbers 9502593, 9502594, 9505596, and 9505597. Exhibit J is a certified copy of the petitioner's judgment in case number 9505596. The judgment reflects that the petitioner pled guilty on February 16, 1996, to aggravated robbery in violation of Tennessee Code Annotated section 39–13–401. The petitioner received a five-year sentence to be served concurrently with case numbers 9505597 and 9505598.

*Smith v. State,* 2011 WL 3912811, at *2-6.

A claim that ineffective assistance of counsel has deprived a habeas petitioner of his Sixth Amendment right to counsel is controlled by the standards stated in *Strickland v. Washington*, 466 U.S. 668 (1984). To demonstrate deficient performance by counsel, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance. [*Strickland*, 466 U.S.] at 689, 104 S. Ct. 2052. The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed

_____

[17] We are compelled to note that the petitioner admitted all of these documents without any testimony to explain their relevance. We acknowledge that the judgments identifying the petitioner by name have overlapping case numbers with the other sentences to be served concurrently. However, the Wickfall judgment contains a different name and social security number. It is therefore unclear whether the petitioner contends that he was, in fact, convicted as Rodney Wickfall in this case.

the defendant by the Sixth Amendment.' *Id.*, at 687, 104 S. Ct. 2052." *Harrington v. Richter*, 562 U.S. at 104.

To demonstrate prejudice, a prisoner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.[18] "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' [*Strickland*, 466 U.S.] at 693, 104 S. Ct. 2052. Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' *Id.*, at 687, 104 S. Ct. 2052." *Richter*, 562 U.S. at 104; *see also id.* at 112 ("In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. . . . The likelihood of a different result must be substantial, not just conceivable.") (citations omitted); *Wong v. Belmontes*, 558 U.S. 15, 27 (2009) (per curiam) ("But *Strickland* does not require the State to 'rule out' [a more favorable outcome] to prevail. Rather, *Strickland* places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different.").

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky,* 559 U.S. 365, 371 (2010).

> An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to

---

[18] "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant." *Id.* at 697. If a reviewing court finds a lack of prejudice, it need not determine whether, in fact, counsel's performance was deficient. *Id.*

serve. *Strickland*, 466 U.S., at 689-690, 104 S. Ct. 2052. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id.*, at 689, 104 S. Ct. 2052; *see also Bell v. Cone*, 535 U.S. 685, 702, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S., at 690, 104 S. Ct. 2052.

*Richter*, 562 U.S. at 105.

When an ineffective assistance claim is reviewed under § 2254(d), the review is "doubly

deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.*, at 689, 104 S. Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles,* 556 U.S., at ——, 129 S. Ct. at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ——, 129 S. Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Richter*, 562 U.S. at 105.

In sub-claim (i), Smith argues that his trial counsel rendered ineffective assistance by

failing to retain a ballistics expert to examine the bullets found at the crime scene and the bullet

taken from Travis Watt's arm. (Am. § 2255 Mot. at PageID 61-62, *Smith v. Parris,* No.

2:12-cv-02436-STA-dkv (W.D. Tenn.), ECF No. 7.) He explains:

Petitioner contends that trial counsel was ineffective for failing to obtain a ballistics expert during the guilty phase of trial. Specifically, the evidence presented at trial demonstrates that (1) no weapons were recovered from the crime

78

scene; (2) there were two different shell casings found at the scene of the crime two (2) .9 mm and three .32 caliber; (3) his son (Travis Watts) sustained a gunshot wound to the arm; (4) bullet holes were found in the car; and (5) no ballistics test or examination was performed on the shell casings recovered from the scene of the crime.

. . . .

A ballistics expert, Petitioner claims, would have corroborated his self defense, actual innocence claims; and testimony during trial that the victim died from a shot fired from some one other than him and that the wounds his son Travis Watt suffered was consistent with his account of the murder. More specifically, trial counsel did not obtain the services of a forensic consultant specializing in shooting reconstruction to buttress his self defense and/or actual innocent claim.

. . . .

Here it is the contention of the Petitioner that it was unreasonable and prejudiced Petitioner in not obtaining a ballistics expert in the instant case. The bullet removed form [sic] the Petitioner's son arm would have been identified as coming from another weapon and would have proven that it could not have been fired from Petitioner's weapon.

. . . .

Also, it is the contention of the Petitioner that a ballistics expert would have corroborated Petitioners self defense and actual innocent theory by demonstrating that there were two different bullets recovered at the crime scene that could not have been shot with the same handgun. Ballistics evidence could have established the existence of a second shooter.

. . . .

The Petitioner contends that at no time during the State Post-Conviction hearing did trial counsel testify that he did in fact contact a ballistics expert and discuss the facts of Petitioner's case with them. Based upon such fact, it is apparent that trial counsel did not take the necessary steps to determine whether a ballistics expert's testimony could support the defense theory of the case. Trial counsel was not informed by any expert that no such testimony could be rendered, therefore; his decision not to call a ballistics expert was unreasonable in light of the circumstances. Thus, this Court can only find that trial counsel's performance was deficient in this regard.

. . . .

Petitioner contends trial counsel did not consider whether it was appropriate to present a ballistics expert in the defense, and failed to make a reasonable determination that such expert could not render the testimony he sought, *i.e.,* that the Petitioner shooting of the victim was in the heat of passion, self defense, or that he was actually innocent of the murder.

. . . .

As it relates to the issue of trial counsel's failure to obtain a ballistics expert during the guilt phase of trial, Petitioner contends that failing to complete a simple but incredibly important task that would have completely impeached the testimony and credibility of each and every eyewitness that testified for the State. All State witnesses testified that the Petitioner had a .9 mm pistol and no other person was armed with a weapon. While only a single .9 mm shell casting was recovered from the scene on the porch and driveway, two people very far apart were shot from two different angles. These facts can only mean that persons other than the Petitioner were also shooting. No matter what type of bullet was recovered from the arm of Petitioner's son, that bullet would have been exculpatory evidence for the Petitioner.

. . . .

More over, it is the contention of the Petitioner that had the bullet been ammunition from a .9 mm, the ballistics evidence and proof would have shown that he shot his own son, and not the victim as only two (2) .9 mm shell casings was found at the scene. Had the bullet recovered from the Petitioner's son been from a .32 caliber weapon, the evidence would have conclusively proven that Petitioner and his family were in danger of deadly force. Again, trial counsel's theory of defense was to argue heat of passion, self defense, or that he was actually innocent of the murder. The fact that adversaries had readily available weapons and actually used them is a fact that bolsters either theory.

(*Id.* at PageID 61-63 (internal quotations marks and citations omitted).)

Smith raised sub-claim (i), the failure to hire a ballistics expert to examine the bullet from Travis Watts' arm, in the post-conviction proceeding. The post-conviction court denied relief on the merits, reasoning as follows:

There was also no proof presented during the hearings on this petition showing that the assistance of a ballistics expert would have helped the petitioner. In *Owens v.*

80

*State,* 13 S.W.3d 742, 756 (Tenn. Crim. App., 1999), the proper standard for review of this issue was set out as follows:

> The appellant contends counsel was deficient by failing to request investigative services or to file a continuance motion due to a lack of investigation. For purposes of proving an ineffective assistance of counsel claim, proof of deficient representation by omission requires more than a speculative showing of a lost potential benefit. The appellant failed to produce any evidence at the post-conviction hearing indicating that an investigator would have discovered any information favorable to her case. Accordingly, this allegation of deficient performance fails both prongs of Strickland and is without merit.

There were two separate types of casings found at the scene, in different locations. Proof at trial showed that one type was left around the porch area where the killing took place. The other type was found in a trail to the petitioner's car. At the beginning of the defendant's cross-examination during the hearing, he admitted that he did not produce the gun he fired for either his attorney or the police for ballistics comparison. If further proof were offered, it would probably have shown that not only were the different casings fired by two separate guns, but also that the trail of casings leading to the car would have been fired at the petitioner as the petitioner was running from the porch to the car to escape after the murder, which would still not have helped his theory of self defense. A ballistics comparison may just as easily have destroyed his theory of self defense. As it was, his attorney was able to cross-examined [sic] the officers during the trial about the absence of a ballistics comparison, seeking to create reasonable doubt.

The testimony of witnesses at trial, including those of the petitioner's son and brother, the bullet wound to the petitioner's son and bullet holes in the car used in the petitioner's escape clearly raised the issue of gunshots being fired by others as the petitioner ran away from the killing to his car to leave the scene. No ballistics test was needed to raise this issue. The state admitted that there were two guns and there was return fire from either Reginald Sanders or "Black," a witness whom no one could locate, in its closing argument. "Were guns being fired out there? Of course they were. Of course they were." Transcript of the trial, p. 476. "Of course two guns were out there. I told you all that from the beginning. Who shot the other gun? Maybe it was Black, but he's not here, and he's not on trial." *Id.* at 514. "Did Black shoot a gun from the side of the house? Maybe he did. So what. Isn't that reasonable?" *Id.* at 515.

The presentation of ballistics evidence would have raised the question in the jurors' minds as to why the petitioner had not produced his weapon for his own ballistics expert. The Court of Criminal Appeals in its opinion affirming the petitioner's conviction for murder second degree summed up this issue as follows:

In the present case, the jury was presented with evidence that the defendant stated to the victim that he would kill on behalf of his son. During the initial confrontation, the victim remained calm and attempted to communicate with the defendant. The defendant grabbed Marcus, the victim's son, and placed the gun to his head while threatening to shoot him. The victim was unarmed at all times. The defendant attempted to enter the victim's residence with the weapon drawn until he was pulled back by the victim. The defendant shot the victim at close range and continued firing the weapon after falling from the porch and during his retreat to the car.

There was evidence which strongly indicated that shots were fired at the defendant's car and its occupants. However, no witness stated that these shots were fired until after the victim was fatally wounded and the defendant's group was escaping the scene.

*Smith, supra,* at 4. This issue fails for a lack of clear and convincing evidence offered that it would have been in the petitioner's best interest to have obtained a ballistics expert. The petitioner's attorney testified at the hearing that he thought the different caliber casings in the yard would be sufficient to show another shooter. (Transcript of February 14, 2008 Hearing, p. 23).

(Order Denying Pet. for Post-Conviction Relief at 6-7, *Smith v. State,* No. 02-09026 (Shelby Cnty. Crim. Ct.), ECF No. 14-11 at PageID 956-57.)

Smith raised the issue in sub-claim (i) in his brief to the TCCA on the post-conviction appeal. (Br. of the Appellant at 6, 19-21, *Smith v. State,* No. W2010-00305-CCA-R3-CD (Tenn. Crim. App.), ECF No. 14-16 at PageID 1159, 1172-74.) The TCCA affirmed the order of the post-conviction court, reasoning as follows:

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. T.C.A. § 40–30–103 (2006). The Tennessee Supreme Court has held:

A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim

of ineffective assistance of counsel, is de novo with no presumption of correctness.

*Vaughn v. State*, 202 S.W.3d 106, 115 (Tenn. 2006) (internal quotation and citations omitted). "The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence." *Id.* (citing T.C.A. § 40–30–110(f); *Wiley v. State*, 183 S.W.3d 317, 325 (Tenn. 2006)). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n. 3 (Tenn. 1992)).

*Vaughn* further repeated well-settled principles applicable to claims of ineffective assistance of counsel:

> The right of a person accused of a crime to representation by counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. Both the United States Supreme Court and this Court have recognized that this right to representation encompasses the right to reasonably effective assistance, that is, within the range of competence demanded of attorneys in criminal cases.

*Vaughn*, 202 S.W.3d at 116 (internal quotations and citations omitted).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. *Id.* (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). This standard applies equally to appellate counsel as to trial counsel. *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069).

A petitioner successfully demonstrates deficient performance when the clear and convincing evidence proves that his attorney's conduct fell below "an objective standard of reasonableness under prevailing professional norms." *Id.* at 369 (citing *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2065; *Baxter*, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "a reasonable probability that, but for counsel's unprofessional errors, the result of

the proceeding would have been different." *Id.* at 370. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068).

We note that "[i]n evaluating an attorney's performance, a reviewing court must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999) (citing *Strickland*, 466 U.S. at 689, 104 S. Ct. 2065). A court will defer to counsel's tactical or strategic choices as long as they are informed by adequate preparation. *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). Moreover, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Strickland*, 466 U.S. at 688–89, 104 S. Ct. at 2065.

. . . .

The petitioner claims trial counsel was ineffective for failing to obtain funds for a ballistics expert and failing to examine the bullet recovered from Travis Watt. He claims that this was deficient and prejudicial because it would have shown that another gunman was present and shooting at the petitioner and his son. According to the petitioner, the evidence would have bolstered his theory of self-defense or the alternative theory that someone else fatally shot the victim. The State contends the trial court properly denied relief because the petitioner failed to provide a weapon to compare to the recovered bullets. The State additionally argues, as pointed out by the trial court, "there were two different shell casings found at the scene which a jury may have found supported a self-defense, and that any ballistics examination of the bullet might have undermined such a defense." We agree with the State.

In denying relief, the post-conviction court stated that the petitioner did not present evidence concerning the benefit to be gained from any additional investigation. The court, quoting *Owens v. State*, 13 S.W.3d 742, 756 (Tenn. Crim. App. 1999), ruled that the petitioner must show that an investigator or expert would have discovered information favorable to the petitioner's case. The court summarized the evidence at the petitioner's trial, including the presence and location of two different shell casings, the gunshot wound to Watt, and the bullet holes in the car the petitioner used to escape. The court found that additional ballistics evidence would have weakened the petitioner's self-defense claim by demonstrating more conclusively that the bullets that injured Watt and hit the car were fired after the petitioner fatally shot the victim. In the absence of such expert ballistics testimony, according to the court, trial counsel was able to attempt to create reasonable doubt by crossexamining [sic] police witnesses regarding the lack of ballistics investigation. The court stated:

The testimony of witnesses at trial, including those of the petitioner's son and brother, the bullet wound to the petitioner's son and bullet holes in the car used in the petitioner's escape clearly raised the issue of gunshots being fired by others as the petitioner ran away from the killing to his car to leave the scene. No ballistics test was needed to raise this issue.

The record does not preponderate against the findings of the post-conviction court. The proof at the post-conviction hearing established that trial counsel believed ballistics proof was unnecessary to support a claim of self-defense or any other theory of the case. In trial counsel's view, the bullet from Watt was not relevant to the shooting on the porch because Watt was shot as he was fleeing with the petitioner, after the fatal shooting. Trial counsel further opined that there was ample proof of multiple shooters based on the police recovery of both nine millimeter and .32 caliber shell casings in the yard. Trial counsel was not questioned regarding obtaining funds for a ballistics expert, and the petitioner offered no other proof on this issue. A petitioner who asserts that he received the ineffective assistance of counsel based upon his attorney's failure to investigate a case properly bears the burden at the post-conviction hearing of demonstrating what that investigation would have revealed. *Owens v. State*, 13 S.W.3d at 756. The petitioner has not demonstrated by clear and convincing evidence that trial counsel rendered ineffective assistance of counsel on this issue. Accordingly, the petitioner has failed to demonstrate deficient performance or prejudice as a result. He is not entitled to relief on this issue.

*Smith v. State,* 2011 WL 3192811, at *6-7, 9.

In his Reply, Smith argues that the decision of the TCCA was an unreasonable application of *Strickland.* (Reply at 10, *Smith v. Parris,* No. 2:12-cv-02436-STA-dkv (W.D. Tenn.), ECF No. 35.) Petitioner has not satisfied his burden of demonstrating that "the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter,* 562 U.S. at 103. Trial counsel's belief that the evidence presented at trial was sufficient to show that there were two shooters was not objectively unreasonable. In its opinion on direct appeal, the TCCA noted that "[t]here was evidence which strongly indicated that shots were fired at the defendant's car and its occupants." *State v. Smith,* 2006 WL 3147056, at *3. Both nine millimeter and .32 caliber

casings were found in the yard. There were bullet holes in the car driven by Albert Smith, and Travis Watt was shot in the arm. There was more than sufficient evidence to permit Smith to argue for the presence of a second shooter. Smith also fails to address the points made by the post-conviction court and adopted by the TCCA about how a ballistics expert could have undermined his defense, either by highlighting the fact that he failed to turn his weapon over to be examined or by providing support to the State's theory that the additional shots were fired by a second gunman after Smith had shot the victim and was fleeing the scene. Therefore, the TCCA's conclusion that Smith failed to show deficient performance or prejudice is not objectively unreasonable.

In sub-claim (ii), Smith complains that his attorney failed to thoroughly cross-examine the witnesses to the crime and, in particular, Reginald Sanders and Lacotra Blair. (Am. § 2254 Pet. at PageID 61, 64-65, *Smith v. Parris,* No. 2:12-cv-02436-STA-dkv (W.D. Tenn.), ECF No. 7.)[19] According to Smith:

> As it relates to the issue of trial counsel's failure to thoroughly cross examine State witnesses to the crime (Reginald Sanders and Lacotra Dorsey). Specifically, these two witnesses were initially picked up by the Memphis Police Department, (Sargent Mullins and Detective Greer). More specifically, Reginald Sanders was initially interviewed as a possible suspect responsible for the victims death and during said made a statement that amounted to an admission to the crime of shooting the victim. In addition, the written statement of Reginald Sanders was never entered into evidence by trial counsel.
>
> . . . .
>
> Petitioner posits that during the Post-Conviction evidentiary hearing Sargent Mullins testified in pertinent part that "[T]he statement we took from him as I believe as a witness, possible suspect, since his true statement was not certain. And we were going to ask him if he indeed fired any shoots".

---

[19] The briefs and orders addressing this issue consistently refer to Lacotra Blair as Lacotra Dorsey. The Court will refer to the witness as Lacotra Blair, the name she used at trial.

. . . .

Here, the Petitioner identifies two (2) State witnesses that makes statements alluding to the fact that they possibly murdered the victim and/or had some participation in such acts. Trial counsel's failure to investigate, interview, and call these witnesses, where he knew of them, and the testimony that they would have given in regards to their being interrogated and the statements that they made placing them at the scene of the crime and alluding to the possibility of their killing the victim. Thus, trial counsel erred greatly in failing to adequately and properly cross-examine these witnesses based upon the simple reason that their testimony would have provided Petitioner with exculpatory evidence and/or testimony.

. . . .

More over, it is the position of the Petitioner that it was States theory that he shot the victim, however, the proffered testimony contained within the written statement of Reginald Sanders would have been inconsistent with the prosecutions theory. To be sure, any testimony by Reginald Sanders relative to the written statement and/or "admission" would have raised a reasonable doubt regarding Petitioner's guilt.

(*Id.* at PageID 64-65.)[20]

In his Answer, Respondent argues that sub-claim (ii) is barred by procedural default insofar as it relates to counsel's cross-examination of Lacotra Blair. (Answer at 15-16, *Smith v. Parris,* No. 2:12-cv-02436-STA-dkv (W.D. Tenn.), ECF No. 7.) In his brief to the TCCA on the post-conviction appeal, Smith argued, *inter alia,* that his attorney was ineffective in failing to question Reginald Sanders about his status as a possible suspect. (Br. of the Appellant at 21, *Smith v. State,* No. W2010-00305-CCA-R3-CD (Tenn. Crim. App.), ECF No. 14-16 at PageID 1174.) Smith made no argument that his attorney failed to question Lacotra Blair about an

---

[20] In his Reply, Smith argues that trial counsel also failed properly to cross-examine Christine Sanders and the 911 operator. (Reply at 11, *Smith v. Parris,* No. 2:12-cv-02436-STA-dkv (W.D. Tenn.), ECF No. 35.) Smith did not raise his attorney's cross-examination of those witnesses in his original or amended § 2254 Petitions, and he did not seek leave to amend to raise those additional issues. Therefore, the only issue that has been properly presented is counsel's cross-examination of Reginald Sanders and Lacotra Blair.

incriminating statement that she may have made. Because there is no longer any avenue for raising these claims, they ordinarily would be barred by procedural default.

In his Reply, Smith argues that the Supreme Court's decisions in *Martinez v. Ryan* and *Trevino v. Thaler* can overcome his default. (Reply at 13, *Smith v. Parris,* No. 2:12-cv-02436-STA-dkv (W.D. Tenn.), ECF No. 35.) However, Smith is not entitled to relief under *Martinez* and *Trevino* because he has not demonstrated that this ineffective-assistance claim was "substantial." *See supra* p. 10. Smith has cited to no evidence in the record, and has not attached any evidence to his § 2254 Petition, establishing that Lacotra Blair made any prior statement that can be construed as an admission that she participated in the shooting of her father. Lacotra Blair's testimony at trial was that Smith shot the victim and that Smith was the only person on the scene who had a gun. *See supra* pp. 28-35. Therefore, sub-claim (ii) is barred by procedural default insofar as it relates to counsel's cross-examination of Lacotra Blair.

The post-conviction court rejected Smith's claim that his attorney did not properly cross-examine Reginald Sanders, reasoning as follows:

> The only proof presented on this issue concerned a notation in a police report by the case officer. Exhibits D and E are copies of a supplementary police report issued by Lt. J. T. Hester which states in pertinent part as follows:
>
>> 2320 HRS. WRITER WAS INFORMED BY DET. B. NEWSOM THAT THE VICTIM ANTHONY DORSEY WAS DOA AT THE MED AFTER SURGERY AT 2145 HRS. SEE SUPPLEMENT BY DET. NEWSOM #6256, CAR 1635
>>
>> WITNESSES REGINALD SANDERS AND LACOTRA DORSEY WERE PICKED UP AT THE MED BY DET. NEWSOM AND RETURNED TO FELONY RESPONSE FOR TYPED STATEMENTS.
>>
>> 2325 HRS. DET. NEWSOM AND DET. CARTER TOOK A TYPED STATEMENT FROM WITNESS LACOTRA DORSEY

> 2335 HRS. SGT. MULLINS AND DET. GREER STARTED
> INTERVIEW WITH WITNESS REGINALD SANDERS AND HE WAS
> ADVISED OF HIS RIGHTS AND WAIVED HIS RIGHTS AND GAVE
> A TYPED STATEMENT OF ADMISSION. THIS WITNESS WAS
> NOT CHARGED WITH ANY CRIME AT THIS TIME

Lt. Hester was called as a witness at the hearing on the petition, and testified that he was sure the "admission" he referred to in his supplement was not an admission of a crime, but most likely an admission to other officers that he was present on the scene. Lt. Hester was not present when Sanders gave his statement, nor had he ever read any statement. Sgt. Mullins, who interviewed Sanders, testified at the hearing that "the statement we took from him was as I believe as a witness, possible suspect, since his true statement was not certain. And we were going to ask him if he indeed fired any shots." (Transcript of the May 15, 2008 Hearing, p. 17).

The written statement of Reginald Sanders was never offered as an exhibit at the hearing on this petition by the state or the petitioner, and so this court has had no opportunity to examine it. However, it was used to cross-examine Sanders at trial by the petitioner's trial attorney. The trial record reflects that in the statement, Sanders stated he was inside the house protecting a female family member during the shooting, and denied ever firing a weapon. Lt. Hester never testified at the trial, having no personal knowledge of anything material, and so could not have been cross-examined about his word "admission" in his supplement. As he never interviewed, took or read any statement by Sanders, he could not have testified to it as a witness called by the defense at trial, having no personal knowledge. Tenn. R. Evid. 602. Sgt. Mullins did testify at trial to the chain of custody of the bullet taken from the petitioner's son's arm, but no proof has been offered that he heard Sanders admit to anything that might exculpate the petitioner or inculpate himself in the murder. Further cross-examination on this subject would have produced nothing favorable on behalf of the petitioner. This allegation is without merit.

(Order Denying Pet. for Post-Conviction Relief at 8, *Smith v. State,* No. 02-09026 (Shelby Cnty. Crim. Ct.), ECF No. 14-11 at PageID 958.)

Smith raised the issue in his brief to the TCCA on the post-conviction appeal. (Br. of the Appellant at 21, *Smith v. State,* No. W2010-00305-CCA-R3-CD (Tenn. Crim. App.), ECF No. 14-16 at PageID 1174 ("Counsel also failed to aggressively question State witness Reginald Sanders about his status as a 'possible suspect.'").) The TCCA rejected this claim on the merits for the following reasons:

The petitioner next claims that trial counsel provided ineffective assistance by failing to thoroughly cross-examine witnesses to the crime. . . .   The petitioner further argues that trial counsel failed to "aggressively" question Reginald Sanders, initially a suspect in the case . . . .   The State misapprehends the petitioner's issue and argues that the petitioner failed to carry his burden because none of these witnesses were presented at the post-conviction hearing.

This court has previously held that "cross-examination is a strategic and tactical decision of trial counsel which is not to be measured by hindsight."  *State v. Kerley*, 820 S.W.2d 753, 756 (Tenn. Crim. App. 1991).  "Allegations of ineffective assistance of counsel relating to matters of trial strategy or tactics do not provide a basis for post-conviction relief."  *Taylor v. State*, 814 S.W.2d 374, 378 (Tenn. Crim. App. 1991). . . .

The only question asked of trial counsel at the post-conviction hearing regarding his cross-examination of Reginald Sanders was whether trial counsel recalled asking Sanders about the "admission" referred to in exhibit D.  Trial counsel could not recall, and the petitioner offered no other proof on this issue. . . .   The record supports the post-conviction court's denial of relief on this issue.  Accordingly, the petitioner has failed to show deficient performance or prejudice as a result.   He is not entitled to relief on this issue.

The petitioner further asserts that trial counsel provided ineffective assistance in failing to investigate a police report written by Lieutenant J.T. Hester that contained an "admission" by Reginald Sanders.  The petitioner argues that trial counsel should have explored the statement of admission that Sanders gave to police in an effort to prove Sanders' culpability for the victim's death.   The State contends this issue is waived because the petitioner did not provide the statement at the hearing or present Reginald Sanders as a witness.   We agree with the State.

Concerning this issue, the post-conviction court determined that cross-examination on the subject would not have aided the petitioner's case.   The court considered exhibits D and E and the post-conviction hearing testimony of Lieutenant Hester and Sergeant Mullins.   The court found that Lieutenant Hester was not present when Sanders gave a statement to police and had no knowledge of the substance of the statement.   The court found that Sergeant Mullins was present for Sanders' statement.   Although Sanders' statement was never admitted as an exhibit at the post-conviction hearing, the post-conviction court examined the trial record to determine the content of the statement and found that Sanders said "he was inside the house protecting a female family member during the shooting, and denied ever firing a weapon."   The court stated that there was no proof that Sanders admitted "anything that might exculpate the petitioner or inculpate himself in the murder."

The record does not preponderate against the findings of the trial court on this issue. Lieutenant Hester testified at the post-conviction hearing that he had no knowledge of the statement that Sanders gave to the police. Rather, he simply prepared the report, exhibits D and E, that indicated Sanders gave an "admission." He testified that he did not believe the statement was an admission of culpability. Sergeant Mullins testified at the post-conviction hearing that he questioned Sanders as a possible suspect and took a statement from Sanders. However, the petitioner did not admit Sanders' actual statement, question trial counsel on the content of the statement, or otherwise include Sanders' actual statement in the record on appeal. Accordingly, the petitioner has not proven deficient performance or prejudice as a result. He is not entitled to relief on this issue.

*Smith v. State,* 2011 WL 3912811, at *10-11.

In his Reply, Smith asserts that the TCCA's resolution of this issue was an unreasonable application of *Strickland v. Washington*. (Reply at 11, *Smith v. Parris,* No. 2:12-cv-02436-STA-dkv (W.D. Tenn.), ECF No. 35.) Smith's position is not persuasive. Sub-claim (ii) appears to be constructed entirely out of the fact that the police report refers to an "admission" by Reginald Sanders. As the TCCA pointed out, the record does not include a copy of Reginald Sanders' statement to the police, *Smith v. State,* 2011 WL 3912811, at *11, and the officer who took the statement testified at the post-conviction hearing that he did not believe that Reginald Sanders admitted to any crime, *id.* at *4. At trial, Reginald Sanders testified that Robert Smith shot the victim, and he denied that he had had a gun and had shot at Robert Smith or Travis Watt. *See supra* pp. 52-59. Smith has not satisfied his burden of demonstrating that the TCCA's conclusion that he has not shown deficient performance or prejudice is "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter,* 562 U.S. at 103.

In sub-claim (iii), Smith claims that his trial counsel was ineffective because he failed to challenge the indictment on the grounds that no affidavit of complaint was issued and there was a

lack of probable cause. (Am. § 2254 Pet. at PageID 61, *Smith v. Parris,* No. 2:12-cv-02436-STA-dkv (W.D. Tenn.), ECF No. 7.) The factual basis for this sub-claim is as follows:

> The petitioner avers that trial counsel was ineffective in failing to challenge the indictment in this case on the grounds that he was arrested without (1) a finding of probable cause; (2) the filing of an Affidavit of Complaint; (3) a Warrant Of Arrest; (4) a preliminary hearing. Specifically, he posits that the indictment contained in this case denudes the state trial court of jurisdiction to render a judgment in this case where there was no finding of probable cause; a filing of a Affidavit Of Complaint or Warrant For Arrest. More specifically, under Tennessee law, if a arrest and resulting conviction "does not" meet procedural and constitutional requirements, it is invalid. *State v. Burtis,* 664 S.W.2d 305 (Tenn. Crim. App. 1983). An illegal arrest, lack of probable cause and warrantless arrest invalidates all subsequent proceedings emanating from the void indictment. *State v. Campbell,* 641 S.W.2d 890 (Tenn. 1982). No valid conviction can occur if the charging instrument (indictment) is based upon a lack of probable cause, an arrest warrant, and preliminary hearing.

> . . . .

> More over, Petitioner posits that there was no issuance of a warrant based upon the fulfillment that the "Affidavit of Complaint . . . be made upon oath before a magistrate or a neutral and detached court clerk…." per T.R.Crim.P., Rule 3 and T.C.A. §40-6-203.

> . . . .

> Here, the Petitioner posits that in the instant case there was (1) no affidavit of complaint supporting the convictions entered in this case; (2) no sworn statement supporting the commission of an offense, supporting a warrant, arrest or statement; thus, Plaintiff's [sic] conviction is invalid and thus void. In effect, a affidavit or warrant never existed, and as a consequence, the proceedings and judgement which followed is invalid.

> . . . .

> Further, Petitioner contends that a factually sufficient basis for a probable cause judgement does not appear in the instant case. Clearly, the district attorney general has never been able to produce a copy of a affidavit of complaint in accordance to T.R.Crim.P., Rule 3.

. . . .

Furthermore, the Petitioner contends that Attorney Copeland should have filed a motion in the trial court to dismiss the indictment, because before Appellant could be arrested and charged, there must and should have been an affidavit of complaint, a determination of probable cause, and a hearing before a magistrate.

. . . .

Petitioner contends that "no where" within the State court record or proceedings is there an affidavit of complaint demonstrating that affiant relied on hearsay as defined in T.R. of Evid., Rule 801(c), nor is there a basis for the credibility of the affidant's, victims, or witnesses (Reginald Sanders and Lacotra Dorsey) information regarding the offense or occurrence of second degree murder as alleged in the indictment. As such, a factually sufficient basis for a probable cause determination "does not" appear in the State court record or proceedings in this case. *Spinelli v. United States,* 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969).

. . . .

In addition, Petitioner posits that trial counsel should have filed a Motion To Dismiss in the Criminal Court of Shelby County Tennessee within thirty (30) days from his arraignment on the indictment contained in the case; requesting that the indictment be dismissed without prejudice for the purpose of affording him a Preliminary Hearing per T.R.Crim.P., Rule 5(e)(1), (4).

. . . .

Petitioner also argues that when, as in the instant case, an indictment is returned without a (1) finding of probable cause, (2) hearing before a magistrate, and (3) preliminary hearing there exist a jurisdictional defect as it relates to such indictment.

. . . .

Finally, Petitioner contends that he is being deprived of his Fifth and Fourteenth Amendment right to Due Process by being denied his liberty based upon the defective charging instruments in this case and the resulting convictions.

. . . .

The Petitioner contends that the indictment contained in the instant case is a failure to establish proper jurisdiction for the case to have proceeded forward.

(*Id.* at PageID 65-67 (emphasis omitted).)

Respondent argues that sub-claim (iii) was not exhausted in state court and, because no further avenues for exhaustion exist, the sub-claim is barred by procedural default. (Answer at 3, 23-24, *Smith v. Parris,* No. 2:12-cv-02436-STA-dkv (W.D. Tenn.), ECF No. 13.) In his original post-conviction petition, Smith complained that there was never an affidavit of complaint. (Pet. for Post Conviction Relief at 4, *Smith v. State,* No. 02-09026 (Shelby Cnty. Crim. Ct.), ECF No. 14-11 at PageID 917.) The post-conviction court denied relief on the merits (Order Denying Pet. for Post-Conviction Relief at 2, *id.*, ECF No. 14-11 at PageID 952.) Smith did not raise that issue, or any other aspect of sub-claim (iii), in his brief to the TCCA on the post-conviction appeal. (*See* Br. of the Appellant at 6, *Smith v. State,* No. W2010-00305-CCA-R3-CD (Tenn. Crim. App.), ECF No. 14-16 at PageID 1159.)

In his Reply, Smith argues that his procedural default can be overcome through the Supreme Court's decisions in *Martinez v. Ryan* and *Trevino v. Thaler.* (Reply at 13, *Smith v. Parris,* No. 2:12-cv-02436-STA-dkv (W.D. Tenn.), ECF No. 35.) Smith is not entitled to rely on *Martinez* and *Trevino* for two reasons. First, the failure to challenge the indictment because there was no affidavit of complaint was actually litigated in the post-conviction court. *Martinez* does not apply to claims that post-conviction appellate counsel failed to exhaust. *Wallace v. Sexton,* 570 F. App'x 443, 453 (6th Cir. 2014) ("In the instant case, Wallace's claims were properly presented to the post-conviction trial court, which denied all of his claims on the merits. Thus, the alleged ineffective assistance of Wallace's post-conviction appellate counsel is not cause to excuse the procedural default of his defense-theory claims, and we may not consider these claims on the merits."); *see also Martinez*, 132 S. Ct. at 1316 ("While counsel's errors in [other levels of

94

post-conviction] proceedings preclude any further review of the prisoner's claim, the claim will have been addressed by one court, whether it be the trial court, the appellate court on direct review, or the trial court in an initial-review collateral proceeding."). Therefore, *Martinez* and *Trevino* are inapplicable to Smith's claim that his attorney was ineffective in failing to challenge the indictment because there was not affidavit of complaint.

Second, *Martinez* and *Trevino* cannot excuse Smith's default of any remaining portions of sub-claim (iii) that were not presented to the post-conviction court because those claims are not "substantial." *See supra* p. 10. The remainder of sub-claim (iii) appears to rest on the premise that an indictment is void unless an affidavit of complaint had previously issued. The post-conviction court rejected that premise, stating as follows:

> The petitioner cites Tenn. R. App. P. 3, Tenn. Code Ann. § 40-6-203 and *State v. Wilson,* 6 S.W.3d 504, 507 (Tenn. Crim. App. 1998), for the proposition that no affidavit of complaint was filed in his case, his attorneys should have asked that the indictment be dismissed. However, these three authorities only apply when a defendant is arrested prior to indictment, when initial probable cause is found by a magistrate and then at a preliminary hearing. The technical record in this case reveals that the petitioner was arrested on July 13, 2003, the day after a capias was issued pursuant to indictment. As probable cause was found by a Shelby County Grand Jury prior to the issuance of a capias, no sworn affidavit of complaint stating probable cause needed to be filed or presented to a magistrate. This allegation is meritless.

(Order Denying Pet. for Post-Conviction Relief at 2, *Smith v. State,* No. 02-09026 (Shelby Cnty. Crim. Ct.), ECF No. 14-11 at PageID 952.)

Smith was arrested pursuant to a capias warrant after the return of the indictment. *See* http://jssi.shelbycountytn.gov/ (Indictment # 02 09026). Rule 9(a)(1) of the Tennessee Rules of Criminal Procedure provides that, "[a]fter the grand jury returns an indictment or presentment, the clerk shall issue a capias or a criminal summons for each defendant named in the indictment or

presentment . . . who is not in actual custody[.]" Instead of an initial appearance before a magistrate, a criminal defendant who has been indicted is arraigned, at which time he enters a plea. Tenn. R. Crim. P. 10. All of these procedures were followed in Smith's case. There is no requirement of an affidavit of complaint for a defendant who is indicted before arrest. Smith did not, and cannot, cite any authority for the proposition that, under Tennessee law, a criminal court lacks jurisdiction over the case where the defendant has been indicted without the prior filing of a criminal complaint and supporting affidavit.[21]

Smith is correct that his attorney could have demanded a preliminary hearing. Rule 5(e)(4) provides that,

> [i]f an indictment or presentment is returned against a defendant who has not waived his or her right to a preliminary hearing, the circuit or criminal court shall dismiss the indictment or presentment on motion of the defendant filed not more than thirty days from the arraignment on the indictment or presentment. The dismissal shall be without prejudice to a subsequent indictment or presentment and the case shall be remanded to the general sessions court for a preliminary hearing.

Smith does not explain why this procedure would have been beneficial to him. Given the number of witnesses who saw him shoot the victim, it is a foregone conclusion that the general sessions court judge would have found probable cause. At that point, the matter would have been bound over to the grand jury and a new indictment would have been returned. Tenn. R. Crim. P. 5.1(b).

---

[21] The cases cited by Smith are not on point. In *State v. Burtis,* 664 S.W.2d 305, 308 (Tenn. Crim. App. 1983), the TCCA, interpreting Rules 3 and 4, held that an arrest warrant was illegal because the statements made in support were not under oath. Despite the defendant's unlawful arrest, his confession was held to have been voluntary. *Id.* at 308-09. The TCCA did not hold that the defendant's subsequent indictment was void because of a defect with the arrest warrant.

Smith's citation to *Spinelli v. United States,* 393 U.S. 410 (1969), *abrogated by Illinois v. Gates,* 462 U.S. 213 (1983), is unexplained. *Spinelli* addressed the circumstances in which an informant's "tip" provides probable cause for the issuance of a search warrant. This case does not involve a search warrant. The statements of the numerous witnesses to the shooting provide probable cause to believe that Smith had committed second degree murder.

For all the foregoing reasons, Smith cannot establish either deficient performance or prejudice from his attorney's failure to follow the course of action he now advocates. Because sub-claim (iii) is not "substantial," Smith cannot rely on *Martinez* and *Trevino* to overcome his procedural default.

In sub-claim (iv), Smith argues that his attorney rendered ineffective assistance by failing to challenge the convictions that were used to sentence him as a career offender. (Am. § 2254 Pet. at PageID 61, 68-69, *Smith v. Parris,* No. 2:12-cv-02436-STA-dkv (W.D. Tenn.), ECF No. 7.) He elaborates:

> It is the position of the Petitioner that trial counsel was ineffective in failing to investigate and review his prior criminal history and challenge the criminal record presented by the State. Thus, the services he provided was "below the range expected of reasonable, professional competent assistance of counsel". Therefore, trial counsel's performance "did not" measure up to the standard required under the holding of *Strickland v. Washington.*
>
> . . . .
>
> Specifically, Petitioner further posits that trial counsel was ineffective because he failed to adequately investigate his criminal history and therefore, his sentence was illegally and improperly enhanced. More specifically, his number of prior convictions were miscalculated and such priors were used erroneously in figuring out his prior criminal history" [sic].
>
> . . . .
>
> The Petitioner contends that trial counsel in the instant case had a "duty to make reasonable investigations or to make reasonable decisions that make particular investigations unnecessary". This includes duty to investigate his "most important defense . . . and a duty adequately to investigate and introduce into evidence records that demonstrate factual innocence, or that raise sufficient doubt on that question to undermine confidence on [sic] the verdict. . . . More over, had trial counsel further investigated he would have discovered that he "did not" classify as a Range III, Career Offender per T.C.A. §40-35-108.
>
> . . . .

It is the position of the Petitioner that criminal defendants criminal history almost always has significant bearing on the sentence a defendant will face under the Tennessee Sentencing Reform Act of 1989. Here, the sentence imposed by the trial court was never a possibility in light of his actual criminal history.

. . . .

Additionally, jurisprudence of the United States Supreme Court suggest that any amount of actual jail time has Sixth Amendment significance. *Argersinger v. Hamlin,* 407 U.S. 25, 95 S. Ct. 2006, 31 L. Ed. 2d 530 (1972). Clearly, the amount by which a defendant's sentence is increased by a particular decision may be a factor to consider in determining whether counsel's performance in failing to argue the point constitutes ineffective assistance, under a determinate sentencing scheme as the Tennessee Criminal Sentencing Reform Act of 1989 it cannot serve as a bar to a showing of prejudice. *Glover, id.* Here, in the instant case, where trial strategies, in retrospect, might be criticized for leading to a harsher sentence. In the instant case the Petitioner raises challenges to the trial court's sentencing determinations themselves. It is clear that prejudice flowed from the asserted errors in the sentencing enhancement determinations of the trial court.

(*Id.* at PageID 68-69.)

Smith raised this issue in his original post-conviction petition. (Pet. for Post Conviction Relief at 5-8, *Smith v. State,* No. 02-09026 (Shelby Cnty. Crim. Ct.), ECF No. 14-11 at PageID 918-21.) The post-conviction court rejected sub-claim (iv) on the merits. (Order Denying Pet. for Post-Conviction Relief at 3-4, *id.*, ECF No. 14-11 at PageID 953-54.) Smith raised the issue in his brief to the TCCA on the post-conviction appeal. (Br. of the Appellant at 6, 22-26, *Smith v. State,* No. W2010-00305-CCA-R3-CD (Tenn. Crim. App.), ECF No. 14-16.) The TCCA rejected Smith's arguments on the merits, reasoning as follows:

**III. Prior Convictions at Sentencing**. The petitioner contends that trial counsel was ineffective for failing to challenge four of his prior convictions as "illegal and void" at sentencing. Specifically, the petitioner asserts that these sentences are in direct contravention of Tennessee Code Annotated section 40–20–111 and Rule 32(c)(3)(C) of the Tennessee Rules of Criminal Procedure, which mandate consecutive sentences when a defendant commits a felony while on bail and is convicted of both offenses. If these convictions were properly challenged by trial counsel, the petitioner insists that he would have been sentenced as Range I

standard offender, rather than a Range III career offender. In response, the State contends that the post-conviction court properly denied relief because "nothing on the face of the judgments indicated that the [petitioner] was on bond."

In denying relief on this issue, the trial court stated:

> The exhibits offered do not show by clear and convincing evidence that the petitioner committed any offenses while on bond for others. Even if this were in fact the case, the pleas were entered on different days, and this court cannot tell from the evidence presented whether either plea or even which plea would have been void. This court also does not find that an attorney has a duty to collaterally investigate every prior conviction of his client as a matter of course, without some prompting from his client. To prove a deficiency, a petitioner must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. *See Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland v. Washington*, 466 U.S. 668, 688, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). It is not the "professional norm" of defense attorneys, when appointed or retained to defend a client, to investigate the validity or "voidability" of all their prior convictions. There was no proof presented at the hearings on this petition that the petitioner ever told his attorney that he felt his prior convictions might have had bail bond issues, and it is not normal practice for an attorney to take on such a task as a matter of course.

> . . . .

> This court also does not find prejudice has been shown by clear and convincing evidence. Even assuming that his trial attorney had done this gratuitous investigation and found the convictions suspect, a separate petition to set aside those pleas would have had to have been filed and litigated separately in other courts. Assuming further that his attorney (or another attorney appointed by those courts to handle those collateral matters) was successful in showing the convictions invalid, the state would have had the right to retry those cases prior to the trial on the instant murder indictment, and the petitioner would have had to decide whether to renegotiate the pleas or try them all to separate juries.

We agree with the trial court. Although the petitioner casts this issue as an ineffective assistance of counsel claim, in effect, it is a collateral attack upon his prior convictions. In this vein, Tennessee courts have repeatedly rejected claims in which a defendant attacks a facially valid prior conviction in a subsequent proceeding in which the prior conviction is used to enhance punishment. *State v. McClintock*, 732 S.W.2d 268 (Tenn. 1987); *State v. Prince*, 781 S.W.2d 846 (Tenn.

1989); *Smith v. State*, 757 S.W.2d 683 (Tenn. Crim. App. 1988); *State v. Dobbins*, 754 S.W.2d 637 (Tenn. Crim. App. 1988). In *McClintock*, the Tennessee Supreme Court held:

> [U]nless invalid on its face, a prior judgment of conviction in a court with personal and subject matter jurisdiction cannot be collaterally attacked in a subsequent proceeding in which the challenged conviction is used to enhance punishment. The authorized route for attacking a facially valid, final judgment of conviction is by the Post Conviction Procedure Act. An evidentiary hearing can be afforded in that forum and not at the proceeding in which such prior conviction is used. Once invalidated, the enhancement value of the conviction is also nullified, exposing the enhanced sentence on the subsequent conviction to collateral attack as well.

*State v. McClintock*, 732 S.W.2d at 272.

Our review of the record demonstrates that trial counsel prepared for sentencing by reviewing the petitioner's prior criminal record. Trial counsel determined that the petitioner's status as a career offender was appropriate and could not recall the petitioner being on bond when he committed any previous crimes. Exhibits G, H, I, and J are facially valid judgments. Trial counsel was not obligated to investigate the petitioner's prior convictions beyond the facial validity of the judgments. *Willie James Robinson v. State*, No. 03–C–01–9205–CR00160, 1993 WL 391141, at *1 (Tenn. Crim. App., at Knoxville, Oct. 6, 1993) *perm. to appeal denied* (Tenn. Feb. 14, 1994); *see also Clayton Arnold Veach v. State*, No. 01C01–9204–CR–00140, 1993 WL 75364, at *4 (Tenn. Crim. App., at Nashville, Mar. 18, 1993) *perm. to appeal denied* (Tenn. July 6, 1993) (concluding that counsel was not ineffective by not investigating numerous prior convictions where the prior convictions are facially valid). Moreover, even if trial counsel challenged the prior convictions at the sentencing hearing, under *McClintock*, it would have been futile. *Williams v. State*, 599 S.W.2d 276, 280 (Tenn. Crim. App. 1980). The petitioner has not shown that counsel's performance was deficient or any resulting prejudice. Accordingly, he is not entitled to relief on this issue.

**IV. Prior Convictions on Appeal.** Similar to our discussion and analysis in section III of this opinion, the petitioner contends that appellate counsel was ineffective for failing to challenge the validity of his prior convictions in his direct appeal. In response, the State argues the post-conviction court properly denied relief.

The post-conviction court denied relief on this issue based on the same reasoning and analysis employed in section III of our opinion. Again, we agree with the post-conviction court. Appellate counsel, just like trial counsel, has no

duty to investigate every one of a client's prior convictions. *See Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004) (applying same standards to appellate counsel as trial counsel for purposes of a claim of ineffective assistance of counsel); *Willie James Robinson*, 1993 WL 391141, at *1 (holding that counsel has no duty to investigate all prior convictions). A failure to do so does not constitute deficient representation. Based on the same authority, reasoning, and analysis in section III of this opinion, the petitioner is not entitled to relief.

*Smith v. State,* 2011 WL 3912811, at *10-11.

In his Reply, Smith argues that the TCCA's resolution of sub-claim (iv) involved an unreasonable application of *Strickland v. Washington.* (Reply at 12, *Smith v. Parris,* No. 2:12-cv-02436-STA-dkv (W.D. Tenn.), ECF No. 35.) Smith's argument is not persuasive. Smith has not responded to the TCCA's observation that he has not explained the relevance of the judgments introduced at the post-conviction hearing. *See Smith v. State,* 2011 WL 3912811, at *6 n.6. The TCCA adopted the post-conviction court's factual finding that

[t]he exhibits offered do not show by clear and convincing evidence that the petitioner committed any offenses while on bond for others. Even if this were in fact the case, the pleas were entered on different days, and this court cannot tell from the evidence presented whether either plea or even which plea would have been void.

*Id.* at *11. Smith has made no argument that this finding was objectively unreasonable. Thus, there is no evidence in the record that any of Smith's prior sentences were illegal when they were imposed.

Even if it were assumed that Smith was wrongly sentenced to concurrent terms for one or more offenses that were committed while he was on bond, the TCCA also found that that does not provide a basis for challenging an enhanced sentence. *Id.* at *12 ("Tennessee courts have repeatedly rejected claims in which a defendant attacks a facially valid prior conviction in a

subsequent proceeding in which the prior conviction is used to enhance punishment."). [22]

Therefore, the TCCA concluded that, "even if trial counsel challenged the prior conviction at the sentencing hearing . . . , it would have been futile." *Smith v. State,* 2011 WL 3912811, at *12. Smith has not addressed any of these conclusions by the TCCA. Therefore, he has not satisfied his burden of demonstrating that the TCCA's conclusion that he "has not shown that counsel's performance was deficient or any resulting prejudice," *id.*, is objectively unreasonable.

For all the foregoing reasons, Claim 3 is without merit and is DISMISSED.

Because every claim asserted by Petitioner is without merit, the Court DENIES the § 2254 Petition. The § 2254 Petition is DISMISSED WITH PREJUDICE. Judgment shall be entered for Respondent.

## V.        APPEAL ISSUES

There is no absolute entitlement to appeal a district court's denial of a § 2254 petition. *Miller-El v. Cockrell*, 537 U.S. at 335; *Bradley v. Birkett*, 156 F. App'x 771, 772 (6th Cir. 2005).

---

[22] The federal judges in this district are well aware that Tennessee courts have not been receptive to efforts by criminal defendants to attack prior sentences that have already been served on this basis after the convictions have been used to enhance a subsequent sentence. *See, e.g., Butler v. State*, No. W2012-01512-CCA-R3-CO, 2013 WL 1282313, at *6 (Tenn. Crim. App. Mar. 28, 2013) ("In this case, the petitioner is essentially simply choosing a new vehicle to attack the validity of his prior convictions because they are being used to enhance his federal sentence. As noted, the petitioner has unsuccessfully attempted to challenge the validity of these convictions in both previous habeas corpus and post-convictions petitions to no avail. While we understand why the petitioner persists in his efforts because of the enhanced sentence is he now serving, he cannot continue with needless litigation challenging a boon he was granted in the early 1990s. He pled guilty and completed his shorter concurrent sentences, and he was informed that those convictions could be used against him to enhance future sentences he might receive. It was the petitioner who chose to continue with his actions that resulted in the sentence he is now serving. . . . However, based upon our above analysis and the previous denials of relief, it should now be clear to the petitioner that the fact that his prior Tennessee sentences were imposed concurrently in violation of the statute will not afford him relief at this point. The sentences are now long expired. There is simply no legal remedy available to the petitioner to afford him the desired result.").

The Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2254 petitioner. Rule 11, Rules Governing Section 2254 Cases in the United States District Courts ("§ 2254 Rules"). A petitioner may not take an appeal unless a circuit or district judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).

A COA may issue only if the petitioner has made a substantial showing of the denial of a constitutional right, and the COA must indicate the specific issue or issues that satisfy the required showing. 28 U.S.C. §§ 2253(c)(2) & (3). A "substantial showing" is made when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Cockrell*, 537 U.S. at 336; *see also Henley v. Bell*, 308 F. App'x 989, 990 (6th Cir. 2009) (per curiam) (same). A COA does not require a showing that the appeal will succeed. *Cockrell*, 537 U.S. at 337; *Caldwell v. Lewis*, 414 F. App'x 809, 814-15 (6th Cir. 2011). Courts should not issue a COA as a matter of course. *Bradley*, 156 F. App'x at 773.

In this case, there can be no question that the Amended § 2254 Petition is meritless for the reasons previously stated. Because any appeal by Petitioner on the issues raised in his Amended § 2254 Petition does not deserve attention, the Court DENIES a certificate of appealability.

Rule 24(a)(1) of the Federal Rules of Appellate Procedure provides that a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit. However, if the district court certifies that an appeal would not be taken in good faith, or otherwise denies leave to appeal *in forma pauperis*, the prisoner must file his motion to proceed *in forma pauperis* in the appellate court. *See* Fed. R. App. P. 24(a) (4)-(5). In this case, for the

same reasons the Court denies a certificate of appealability, the Court determines that any appeal would not be taken in good faith. It is therefore CERTIFIED, pursuant to Federal Rule of Appellate Procedure 24(a), that any appeal in this matter would not be taken in good faith, and leave to appeal *in forma pauperis* is DENIED.[23]

IT IS SO ORDERED, this 21st day of August, 2015.

s/ S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

---

[23] If Petitioner files a notice of appeal, he must pay the full $505 appellate filing fee or file a motion to proceed *in forma pauperis* and supporting affidavit in the Sixth Circuit Court of Appeals within 30 days of the date of entry of this order. *See* Fed. R. App. P. 24(a)(5).